**STATE of Utah, Plaintiff and Appellee,**

v.

**Gary Lee MABE, Defendant and Appellant.**

**No. 910444.**

Supreme Court of Utah.

Nov. 23, 1993.

R. Paul Van Dam, Atty. Gen., Kenneth A. Bronston, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Lynn R. Brown, Joan C. Watt, Kimberly Clark, Deborah Kreek Mendez, Salt Lake City, for defendant and appellant.

DURHAM, Justice:

Defendant Gary Lee Mabe appeals his conviction for second degree murder, a first degree felony, in violation of Utah Code Ann. § 76–5–203. Mabe raises only one issue on appeal: whether his confession was involuntarily given in violation of the Fifth and Fourteenth Amendments to the United States Constitution. We affirm.

On December 5, 1990, the body of Carol Mabe, Mabe's wife, was discovered at her place of employment. An autopsy revealed that she had died as a result of blunt force trauma to her head. Evidence at the scene of the crime indicated that Carol Mabe

might have been murdered during a robbery attempt. The police, however, suspected that Mabe was responsible for his wife's death and that he had altered the crime scene to make it appear as though her death occurred during an attempted robbery. Although the police investigation focused on Mabe from the beginning, the police lacked sufficient evidence to proceed with criminal charges against him. By early January 1991, their investigation was at a standstill.

On Friday, January 4, 1991, Mabe voluntarily appeared for an interview at the Salt Lake City Police Department. The purpose of the interview was to discuss his wife's death. At the time of the interview, Mabe was thirty-eight years old and in good physical condition. He had three years of college education and an IQ of 127. Although he is a recovering alcoholic, the trial court found that at the time of the interview, Mabe did not appear to be under the influence of alcohol or drugs and that he was in full control of his faculties.

The interview lasted approximately three hours and was videotaped. Mabe was seated at a table opposite the door to the interrogation room. The two interviewing detectives sat next to him on either side, thereby blocking his access to the door. The interview was continuous; Mabe was not provided with any food or drink and was not given an opportunity—nor did he request one—to use the rest room.[1] The detectives never gave Mabe a *Miranda* warning. The trial court, however, found that Mabe was never placed under arrest nor involuntarily detained and that he never requested the assistance of counsel.

Midway through the interview, the detectives confronted Mabe with the evidence against him. They told him that he was their primary suspect and in their opinion he was guilty of killing his wife. From that point on, the interview was confrontational. The detectives made numerous references to a guilty plea that Mabe entered in a prior, unrelated theft offense (referred to by them as the "Brink's deal"). In that case, Mabe's guilty plea and cooperation with police resulted in probation rather than incarceration. The detectives compared the Brink's deal to the present case and suggested that pleading guilty might result in similarly lenient treatment.[2] In addition, the detectives told Mabe that if he refused to cooperate, he might be charged with a more serious offense.[3] Nonetheless, Mabe steadfastly maintained his innocence throughout the interview.[4]

Three days after the initial interview, on Monday, January 7, 1991, Mabe called and asked one of the detectives to pick him up at his home.[5] Mabe indicated that he wanted to discuss his wife's death. Both detectives picked up Mabe and drove him to the

1. Approximately ten minutes before the interview concluded, the detectives offered Mabe a drink and gave him the opportunity to use the rest room. There were no similar offers prior to that time.

2. Although the detectives made numerous references to the Brink's deal, the following is typical:

   Detective: You know you did this Brink's deal, right? Whether it was alcohol or it was a way out for you whatever, but you know, you probably had some time to think about it and you came back and you did the right thing, right? Do you feel you did the right thing on that Brink's deal? Would you do it any different if you had another out on it? Things worked out for you, right?
   Mabe: Yeah.
   Detective: Well I think things could work out for you again if you'll tell us the truth.

3. The following is characteristic:

   Detective: ... You know if it takes me one year, two years, whatever I'm going to solve this sucker.
   Mabe: I understand.
   Detective: And if and when I charge you if it's the hard way I mean I'm going to sock it to you.

4. The final exchange between Mabe and the detectives was as follows:

   Detective: You need some help, Gary.
   Mabe: I didn't do it.
   Detective: We want to get you that help. You know, we can start tonight doing that.
   Mabe: I didn't do it.
   Detective: Yeh, you did. Sure you did.
   Mabe: Am I free to go?
   Detective: Yep.

5. Apparently, Mabe attempted to contact one of the detectives on Friday night but was unsuccessful.

Salt Lake City Police Department. They did not discuss the matter while en route to the police station. Upon their arrival, the detectives gave Mabe a *Miranda* warning. He acknowledged that he understood his rights and agreed to talk to them. He then confessed to killing his wife. Although Mabe was very emotional, the trial court found that he did not appear to be under the influence of alcohol or drugs and that he understood the consequences of his confession. Mabe also told the detectives that he was distraught over his wife's death and had attempted to commit suicide three times over the weekend.

The State subsequently charged Mabe with second degree murder. He moved to suppress his January 7 confession on the ground that it was involuntary and its use at trial violated his Fifth and Fourteenth Amendment rights. Following an evidentiary hearing, the trial court denied Mabe's motion. Mabe then entered a conditional guilty plea, specifically reserving his right to appeal the trial court's ruling on the motion to suppress. *See State v. Sery,* 758 P.2d 935, 937–38 (Utah Ct.App.1988).

■ Before considering the merits of Mabe's claim, we address briefly the appropriate standard of review. In reviewing a trial court's determination on the voluntariness of a confession, we apply a bifurcated standard of review. *See State v. Thurman,* 846 P.2d 1256, 1269–71 (Utah 1993) (applying bifurcated standard to determinations of voluntariness of consent following police illegality); *State v. Brown,* 853 P.2d 851, 854–55 (Utah 1992) (applying bifurcated standard to consent, plain view, exigent circumstance, and incident-to-arrest exceptions to warrant requirement); *State v. Ramirez,* 817 P.2d 774, 781 n. 3 (Utah 1991) (discussing standards of review for involuntary confessions and eyewitness identifications). Under the bifurcated standard, the ultimate determination of whether a confession is voluntary is a legal question, and we review the trial court's ruling for cor-

rectness. *Arizona v. Fulminante,* 499 U.S. 279, ——, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991) (citing *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985)); *Thurman,* 846 P.2d at 1270 n. 11; *see also State v. Miller,* 829 P.2d 132, 134 (Utah Ct.App.1992); *State v. Singer,* 815 P.2d 1303, 1309 (Utah Ct.App. 1991). To the extent the trial court has made subsidiary factual findings, however, those findings will not be set aside unless they are clearly erroneous. *Thurman,* 846 P.2d at 1271; *Ramirez,* 817 P.2d at 781 n. 3; *see also United States v. Jenkins,* 938 F.2d 934, 937–38 (9th Cir.1991); *United States v. Chalan,* 812 F.2d 1302, 1307–08 (10th Cir.1987).

We now turn to the merits of Mabe's claim. The constitutional standard for determining the voluntariness of a confession requires that we independently review the entire record. From this review, we must conclude, based on the totality of circumstances, that Mabe rendered his confession voluntarily. *See Fulminante,* 499 U.S. at ——, 111 S.Ct. at 1252; *State v. Strain,* 779 P.2d 221, 225 (Utah 1989); *State v. Bishop,* 753 P.2d 439, 463 (Utah 1988). There is no simple, mechanistic method for determining whether a confession is voluntary. Instead, we must examine all pertinent factors relating to both " 'the characteristics of the accused and the details of the interrogation.' " *Strain,* 779 P.2d at 225 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)); *Bishop,* 753 P.2d at 463.

■ Mabe claims that the following factors, taken together, rendered the Friday interview impermissibly coercive: (1) the detectives' references to the Brink's deal, which implied Mabe would receive more lenient treatment if he confessed in this case, (2) the detectives' threats to pursue greater charges if Mabe refused to confess, (3) the absence of a *Miranda* warning,[6] (4) the custodial nature of the inter-

---

**6.** Mabe argues that the conditions of the Friday interview establish that he was "in custody" and therefore entitled to a *Miranda* warning. He then argues that because the detectives did not

provide a *Miranda* warning, the interview was presumptively coercive. Mabe, however, failed to raise noncompliance with *Miranda* in the trial court. We have noted, " 'The issues of

view, and (5) Mabe's physical and emotional condition at the time of the interview. Mabe argues that the coercive effects of the initial interview continued throughout the weekend, causing him to confess Monday morning.

In *Strain*, we found statements by a police officer facially coercive because they conveyed a threat of greater punishment, or a promise of lesser punishment, depending on whether the defendant confessed. 779 P.2d at 226–27. Likewise, the detectives' references in this case to the Brink's deal and threats to "sock it to" Mabe may have been impermissibly coercive. Moreover, the failure to provide a *Miranda* warning and the custodial nature of the interview may have contributed to the interview's coercive nature. *See United States v. Pelton*, 835 F.2d 1067, 1072 (4th Cir.1987) ("[T]he absence of *Miranda* warnings is one 'factor' to be considered in assessing the voluntariness of a confession."). However, the important question in this case is not whether the Friday interview was impermissibly coercive, but whether the coercive tactics employed by the detectives overcame Mabe's free will, causing him to confess the following Monday morning. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973); *cf. Thurman*, 846 P.2d at 1263. For the purpose of addressing this issue, we will assume, without deciding, that the Friday interview was impermissibly coercive.

In *Strain*, we found the police interview facially coercive but nevertheless remanded the case to the trial court to determine, based on the totality of circumstances, whether the defendant's confession was voluntary. 779 P.2d at 227. In other words, the fact that the police interview was coercive was not enough, by itself, to render the defendant's confession involuntary. To be involuntary, there must be a causal relationship between the coercion and the subsequent confession. *Id.*; *State v. Hegelman*, 717 P.2d 1348, 1350 (Utah 1986); *see also Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986) ("Absent police conduct *causally related* to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." (emphasis added)); *Evans v. Dowd*, 932 F.2d 739, 741–42 (8th Cir.1991); *United States v. Kelley*, 953 F.2d 562, 565 (9th Cir.1992).[7] We therefore must decide whether such a causal relationship exists between the coercive Friday interview and Mabe's confession the following Monday.

Mabe claims that the coercive effects of the Friday interrogation continued throughout the weekend, prompting him to contact the police Monday morning and ultimately to confess. The State, on the other hand, argues that Mabe's confession likely was motivated by his guilty conscience rather than by the coercive nature of the Friday interview. After reviewing

voluntariness and compliance with *Miranda* are separate constitutional defenses.'" *State v. Bishop*, 753 P.2d 439, 463 n. 67 (Utah 1988) (quoting *United States v. Curtis*, 568 F.2d 643, 647 (9th Cir.1978)). Absent exceptional circumstances, this court will not consider issues raised for the first time on appeal. *See State v. Jameson*, 800 P.2d 798, 801 (Utah 1990); *State v. Anderson*, 789 P.2d 27, 29 (Utah 1990); *see also State v. Loe*, 732 P.2d 115, 117 (Utah 1987) (refusing to consider *Miranda* claim raised for first time on appeal). We find no exceptional circumstances in the present case and therefore conclude that Mabe waived his *Miranda* claim. However, even though he may not separately raise the *Miranda* issue, we will consider the lack of a *Miranda* warning under the totality-of-circumstances test as one "'detail[ ] of the interrogation.'" *State v. Strain*, 779 P.2d 221, 225 (Utah 1989) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)); *Bishop*, 753 P.2d at 463, 465–66; *see also United States v. Pelton*, 835 F.2d 1067, 1072 (4th Cir.1987).

7. In some cases, it may not be necessary to make this sort of individualized showing. When police conduct is particularly egregious, such as an interrogation accompanied by physical violence, the confession may be inadmissible per se. *See, e.g., Stein v. New York*, 346 U.S. 156, 182, 73 S.Ct. 1077, 1091, 97 L.Ed. 1522 (1953), *overruled on other grounds, Jackson v. Denno*, 378 U.S. 368, 391, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908 (1964); *United States v. Jenkins*, 938 F.2d 934, 938–39 (9th Cir.1991). The police conduct in the present case does not rise to this level of egregiousness.

the record and considering the trial court's findings, we conclude that the coercive nature of the Friday interview did not cause Mabe to confess Monday morning. Several facts lead us to this conclusion. First, throughout the Friday interview Mabe consistently maintained his innocence. This fact alone strongly indicates that the coercive police tactics did not overcome his free will. *See Chalan*, 812 F.2d at 1308. Second, at least two and one-half days lapsed between the coercive interview and Mabe's confession, during which time he was not in custody and did not have any contact with police. The passage of time under these circumstances would tend to dissipate any lingering effects of police coercion. *See id.* Third, Mabe initiated the interview with police Monday morning, was properly apprised of his *Miranda* rights, and made a knowing and intelligent waiver of those rights. Finally, based upon our review of the record, we do not believe that Mabe's personal characteristics made him particularly susceptible to coercive police tactics.[8] Indeed, Mabe's statements during the Monday interview indicate that his decision to call the police and confess resulted from his own guilty conscience, not from coercion.[9]

The only facts Mabe points to as evidence of continuing coercion are his suicide attempts over the weekend and his emotional displays during the Monday interview. These facts, however, are not necessarily indicative of the continuing effects of coercion. We agree with the trial court that the suicide attempts and emotional displays are equally consistent with feelings of sorrow and remorse for killing his wife.

In light of the totality of circumstances, we agree with the trial court that Mabe's confession was voluntary and did not result from coercive police tactics. The trial court therefore correctly denied his motion to suppress. Mabe's conviction is affirmed.

HALL, C.J., and HOWE, Associate C.J., and STEWART and ZIMMERMAN, JJ., concur.

---

**8.** Mabe claims that because he is a recovering alcoholic and was grieving over his wife's death at the time of the Friday interview, he was particularly susceptible to coercion. The trial court, however, found that at the time of the interview, he was in good health and lucid and did not appear to be under the influence of alcohol or drugs. Moreover, he had three years of college education and an IQ of 127 and previously had pleaded guilty to a felony. *See, e.g., United States v. Rohrbach*, 813 F.2d 142, 144–45 (8th Cir.) (defendant's history of alcoholism and suicide attempts did not render involuntary his

allegedly coerced confession), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987).

**9.** Following his confession, Mabe stated, "[T]he biggest reason I didn't want you to arrest me Friday is because at that point I knew I was had and I knew that, you know, I was going to have to kill myself. Cause I, I didn't want to go to jail." Later in the interview, Mabe stated: "I don't remember too much about what you guys were saying Friday to be real honest with you. All I wanted to do was get out of here and go home and kill myself. Cause I knew you guys had me. I knew."