2002 UT App 195

**STATE of Utah, Plaintiff and Appellee,**

v.

**Michael BUNTING, Defendant and Appellant.**

**No. 20010016–CA.**

Court of Appeals of Utah.

June 6, 2002.

Edward R. Montgomery, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General, and Jeffrey T. Colemere, Assistant Attorney General, Salt Lake City, for Appellee.

Before BILLINGS, Associate P.J., and DAVIS and GREENWOOD, JJ.

## OPINION

BILLINGS, Associate Presiding Judge:

¶1 Defendant Michael Bunting appeals from a conditional guilty plea to Child Abuse Homicide, a second degree felony, in violation of Utah Code Ann. § 76–5–208 (Supp. 2000). Defendant maintains the trial court erred in denying his motion to suppress incriminating statements he made during an interview with Salt Lake County detectives. We affirm.

## BACKGROUND

¶2 In reviewing the denial of Defendant's motion to suppress, "we recite the facts in a light most favorable to the trial court's findings." *State v. Tetmyer,* 947 P.2d 1157, 1158 (Utah Ct.App.1997). On November 6, 1999, Defendant left his four-year-old son (Son) alone in a bathtub, returning later to find him unconscious. Defendant called 911 and attempted cardiopulmonary resuscitation. Shortly thereafter, paramedics arrived and determined that Son was dead.

¶3 Subsequently, a medical examiner performed an autopsy and determined Son's death was not caused by drowning. The examiner determined Son's brain was swollen consistent with suffocation.

¶4 Based on the medical examiner's findings and other inconsistencies in the evidence, Salt Lake County detectives expanded their investigation of Son's death. The detectives interviewed witnesses, compiled and

reviewed medical records, and conducted a criminal background check. The background check revealed Defendant had numerous DUI convictions and had been charged with cruelty to animals.

¶ 5 In preparation for an interview of Defendant, the detectives contacted Detective Glen Yarborough who had given an interrogation seminar one of the detectives had attended. Based on Defendant's background, Detective Yarborough recommended using a confrontational interview approach involving misrepresentations of the evidence the detectives had implicating Defendant and the "false friend" technique.

¶ 6 On January 21, 2000, the detectives interviewed Defendant at the police station for two and a half hours. The detectives videotaped the interview. At the outset, the detectives asked Defendant whether he had consumed any alcohol the morning of the interview. Defendant indicated that he had had a few beers. After determining that Defendant was not intoxicated, the detectives read Defendant his Miranda rights, which he indicated he understood and waived. During the interview, Defendant appeared comfortable and was attentive and responsive. He did not smell of alcohol or slur his speech, or intimate that he misunderstood the detectives' questions or purpose for the interview.

¶ 7 The detectives informed Defendant that the medical examiner had scientific evidence that Son had not drowned. They then misrepresented that the medical examiner had determined that Son had been murdered. They also told Defendant that the medical examiner and the district attorney were saying that it "was premeditated, first degree murder" and the medical examiner wanted to "hang [him] out to dry." The detectives stated the district attorney was going to charge Defendant with "first degree homicide" or he could explain "exactly everything that happened that night." They further told him they did not think he did it on purpose, suggested Son's death was negligent or reckless, and told him they wanted to show the medical examiner and district attorney that they were wrong.

¶ 8 Defendant replied that the only thing he had not already told the detectives was that he had introduced Freon into Son's bathwater to make bubbles. The detectives then told Defendant that he was "going down for it," it would be better if he came forward with the truth, they did not think he did it on purpose, they were "trying to help [him,]" and they had tried to make him look good. Although repeatedly pressed by the detectives, Defendant denied suggestions that he murdered Son, pushed Son under the water, hit or shook Son, lost his temper, or staged the crime scene. Over half way through the interview, in response to specific questions about Freon, Defendant told the detectives that as an air conditioner repairman he knew the dangers of inhaling Freon in a closed environment, including that it robs lungs of oxygen. He also told the detectives that after introducing the Freon into the bathwater, he left Son alone, and when he checked on Son later, he noticed Son looked tired. He further stated he thought the Freon killed Son, and prior to the paramedics' arrival, he kicked the Freon cannister into Son's bedroom. Thereafter, the detectives asked Defendant if he wanted a drink and permitted him to make a phone call and take a smoke break.

¶ 9 Following the interview, the medical examiner confirmed that Freon exposure caused Son's death. On January 27, 2000, Defendant was charged with Child Abuse Homicide. *See* Utah Code Ann. § 76–5–208 (Supp.2000). The information was later amended to charge Defendant with Murder. *See* Utah Code Ann. § 76–5–203 (Supp.2000). On June 29, 2000, Defendant filed a motion to suppress the statements he made during the interview as products of coercive interrogation tactics intentionally employed by the detectives to take advantage of his mental and psychological conditions.

¶ 10 During the suppression hearing, Defendant and the State offered expert testimony by· psychologists regarding Defendant's mental and psychological conditions. Both psychologists agreed that Defendant's I.Q. is slightly below normal. Defendant's expert opined that Defendant suffered from mild brain damage caused by chronic alcoholism. She further opined that Defendant was particularly vulnerable to the detectives'

interrogation tactics. The State psychologist testified that the tests used by Defendant's psychologist had been proven to be unreliable and identified errors in her test administration. The State psychologist opined that Defendant suffers from a mixed personality disorder, including narcissistic and antisocial features, but he appeared to be functionally normal during the interview.

¶ 11 After considering all of the evidence and viewing the videotape of the interview, the trial court denied Defendant's motion to suppress. The court concluded that based on the totality of the circumstances, Defendant's statements during the interview were voluntary, that neither his understanding nor his ability to exercise free will and make reasonable decisions as to how to respond to the detectives' questions were overcome by the detectives' interrogation tactics, alcohol, or any psychological condition. Following the trial court's denial of his motion to suppress, Defendant conditionally pleaded guilty to Child Abuse Homicide, reserving the right to appeal the denial of his motion.

## ISSUE AND STANDARD OF REVIEW

¶ 12 Defendant argues incriminating statements he made during the interview were the involuntary product of coercion, violating his right to due process under the Fourteenth Amendment and right to protection from compelled self-incrimination under the Fifth Amendment of the United States Constitution. "The ultimate determination of voluntariness is a legal question" that we review "for correctness." *State v. Rettenberger,* 1999 UT 80, ¶ 10, 984 P.2d 1009. "We set aside a [trial] court's factual findings only if they are clearly erroneous." *Id.*

## ANALYSIS

¶ 13 Defendant argues the detectives coerced incriminating statements from him by employing interrogation tactics that played upon his vulnerable mental and psychological conditions. Defendant argues the detectives coerced incriminating statements with misrepresentations about the evidence, threats, promises of leniency, and the false friend technique.

¶ 14 The Fifth Amendment " ' "protects individuals from being compelled to give evidence against themselves." ' " *State v. Rettenberger,* 1999 UT 80, ¶ 11, 984 P.2d 1009 (quoting *State v. Piansiaksone,* 954 P.2d 861, 865 (Utah 1998)) (emphasis and citation omitted). Furthermore, under the Due Process Clause of the Fourteenth Amendment, " ' "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." ' " *Id.* (quoting *Colorado v. Connelly,* 479 U.S. 157, 163, 107 S.Ct. 515, 519, 93 L.Ed.2d 473 (1986)) (citation omitted). In the face of a challenge to the voluntariness of a statement made during an interrogation, these amendments require " 'the prosecution to demonstrate by a preponderance of the evidence that the statement was made voluntarily.' " *Id.* at ¶ 45, 984 P.2d 1009 (quoting *State v. Allen,* 839 P.2d 291, 300 (Utah 1992)). In assessing such a challenge, a trial court "must examine the 'totality of circumstances to determine whether' " a statement was " ' "made freely, voluntarily and without compulsion or inducement of any sort." ' " *Id.* at ¶ 14, 984 P.2d 1009 (quoting *Withrow v. Williams,* 507 U.S. 680, 689, 113 S.Ct. 1745, 1751, 123 L.Ed.2d 407 (1993) (citation omitted)). " 'Evidence sufficient to support a finding that [an incriminating statement] is involuntary must reveal some physical or psychological force or manipulation that is designed to induce the accused to talk when he otherwise would not have done so.' " *Id.* at ¶ 25, 984 P.2d 1009 (quoting *State v. Hegelman,* 717 P.2d 1348, 1350 (Utah 1986)) (emphasis omitted). There must also " 'be a causal relationship between the coercion and the subsequent confession.' " *Id.* at ¶ 18, 984 P.2d 1009 (quoting *State v. Mabe,* 864 P.2d 890, 893 (Utah 1993)). "In other words, the evidence must show that the coercive tactics ... overcame the defendant's free will." *State v. Galli,* 967 P.2d 930, 936 (Utah 1998).

¶ 15 Factors to consider in making the voluntariness determination include "the duration of the interrogation, the persistence of the officers, police trickery, absence of

family and counsel, and threats and promises made to the defendant by the officers." *Rettenberger,* 1999 UT 80 at ¶ 14, 984 P.2d 1009. Other factors to consider include "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* at ¶ 15, 984 P.2d 1009.

■ ¶ 16 Defendant maintains the detectives made numerous misrepresentations rendering his statements involuntary. " '[A] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is.' " *Galli,* 967 P.2d at 936 (concluding half-truth that three co-defendants had implicated defendant in robbery, when only one had implicated defendant, was insufficient to overcome defendant's free will) (citation omitted); *see also Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969) (concluding misrepresentations in regard to statements co-defendant made "while relevant, [were] insufficient . . . to make . . . otherwise voluntary confession inadmissible"); *Clanton v. Cooper,* 129 F.3d 1147, 1158 (10th Cir.1997) (" '[C]ourts have held confessions admissible when they were prompted by such misrepresentations as that the murder victim was still alive, that nonexistent witnesses have been found, that the murder weapon had been uncovered, that the defendant's prints were found at the crime scene, and that an accomplice had confessed and implicated the defendant.' " (Citation omitted)). "However, in certain cases, police misrepresentations may be sufficiently egregious to overcome a defendant's will so as to render a confession involuntary." *Rettenberger,* 1999 UT 80 at ¶ 20, 984 P.2d 1009.

¶ 17 Defendant maintains the following misrepresentations, made at the beginning of the interview, coerced him into making his initial admission about Freon:

> Detective Mitchell: . . . *[T]he hammer is ready to fall,* and that's why we wanted to talk with you, okay?
>
> [Defendant]: Okay.
>
> Detective Mitchell: . . . *The ME has wrapped up his investigation,* okay. *He has forensic evidence—or,* excuse me—
>
> Sgt. Vaughn: *Scientific evidence.* . . .

Detective Mitchell: Okay. [Son] did not drown.

[Defendant]: Uh-huh.

Detective Mitchell: *[Son] was murdered, is what he's saying,* okay. There's evidence of proof we can show that the scene was altered. . . . Do you understand what I am saying there?

[Defendant]: Uh-huh.

. . . .

Sgt. Vaughn: . . . *The medical examiner is saying [Son] was murdered. That leaves you to be the murderer.* If you want to go in front of the judge and a jury, and be seen as a premeditated murderer, and there are no other facts that we need to know about it, I don't think you want that, do you?

[Defendant]: Huh-uh.

. . . .

Sgt. Vaughn: . . . [W]e're going to the district attorney.

. . . .

Now, he can either charge you with first degree homicide, or we can find out from you exactly everything that happened that night. . . . I think it's more like a manslaughter . . . it's something reckless . . . it's something stupid, or maybe something negligent that happened that caused that death. You're the one with the answers. You're the one [who] can bail your ass out. Like I said, *the medical examiners want to hang you out to dry right now.*

. . . .

This is your chance. . . .

. . . .

[Defendant]: *The only other thing that was there that night was I had (inaudible) some bubbles in the tub with a jug of Freon . . . .*

(Emphasis added.)

■ ¶ 18 Although the detectives exaggerated the medical examiner's findings, we conclude the misrepresentations did not overcome Defendant's will. The detectives truthfully told Defendant about the medical examiner's finding that Son did not drown. The detectives then misrepresented that the

examiner determined Son had been murdered and wanted to hang Defendant out to dry, but that they thought Son's death was unintentional. In response, Defendant told the detectives that he put Freon in Son's bathwater to make bubbles. The detectives did not ask Defendant about Freon until he made this initial statement. When asked why he had not told the detectives about the Freon previously, Defendant stated, "[I was] trying not to hang myself. I was hoping it wasn't that."

¶ 19 Defendant argues *State v. Rettenberger*, 1999 UT 80, 984 P.2d 1009, compels us to conclude that the misrepresentations rendered his statements involuntary in the present case. During the interrogation in *Rettenberger*, officers made thirty-six false statements, the overwhelming majority involving complete fabrications about the testimonial and physical evidence against the defendant. *See id.* at ¶ 21, 984 P.2d 1009. The officers repeatedly misrepresented that they had testimony of numerous eyewitnesses and co-defendants who would implicate the defendant and falsely informed him that he had been the subject of an intensive undercover investigation. *See id.* Although the officers had no physical evidence linking the defendant to the crime scene, they told him that they had a wealth of physical evidence [1] so linking him. *See id.* The supreme court concluded that the number and nature of the misrepresentations came close to or exceeded the voluntariness threshold. *See id.* at ¶ 20, 984 P.2d 1009.

¶ 20 *Rettenberger* is distinguishable from the present case. Unlike *Rettenberger*, where there was a complete lack of evidence linking the defendant to the crime, in the present case, Defendant was the only person at the crime scene other than Son. Additionally, although the medical examiner's report did not establish the cause of son's death, it did establish that Son did not drown and raised questions about Defendant's initial story and involvement in Son's death.

¶ 21 Defendant further argues the detectives coerced incriminating statements from him by telling him that he was going to be charged with "premeditated, first degree murder," then suggesting "how to avoid the murder charge." "[A]n interrogation may be 'impermissibly coercive because [it] carried a threat of greater [charge or] punishment or a promise for lesser [charge or] punishment depending on whether [a defendant] confessed.'" *Rettenberger*, 1999 UT 80 at ¶ 29, 984 P.2d 1009 (quoting *State v. Strain*, 779 P.2d 221, 226 (Utah 1989)) (second and fifth alterations in original).

¶ 22 Defendant argues the following statements of the detectives coerced him into making incriminating statements:

[T]he hammer is ready to fall. . . .

What they're saying is they think it was premeditated, first degree murder. [We] don't think that's the case.

[W]e want to find out what happened so we can present that, and show them that they're wrong. . . .

[The district attorney] can either charge you with first degree homicide, or we can find out from you exactly everything that happened that night. . . . [We] think it's more like a manslaughter . . . it's something reckless . . . it's something stupid, or maybe something negligent that happened to cause that death. . . . You're the one [who] can bail your ass out.

This is your chance. . . .

---

1. Specifically the officers told or suggested to him that they found fingerprints at the crime scene; that the crime lab had confirmed were a "positive match" to his; they had ballistic test results implicating him; they had blood samples implicating him; they had a bloody shoe-print from the crime scene that matched his; they had found blood on his shoe; they had unspecified "physical evidence" that linked him to the crime; they had evidence that his car was at the crime scene; they had "blood splatter" evidence connecting him to the crime; they had found fingerprints of "everyone involved" at the crime scene; they had records of phone conversations incriminating him; they had knowledge of the gun used, implicating him; they had incriminating hand prints, palm prints, fingerprints, and shoe prints at the scene of the crime; they had found blood in his car; and they had more evidence implicating [him] than the police had in the O.J. Simpson case. *State v. Rettenberger*, 1999 UT 80, ¶ 21, 984 P.2d 1009.

And you're going down for it, that's not the question here.

[There are] different degrees of murder, that's what we're telling you.

The State responds that the detectives did not explicitly threaten Defendant or promise him leniency but "merely presented [D]efendant with the possibility of being charged with first degree murder" and suggested that a lower charge *could* be sought if he cooperated.

¶ 23 In *Rettenberger*, the supreme court recognized that even *strong suggestions* that a defendant might not face a particular charge or punishment if he confessed "standing alone, may not ... overcome [a defendant's] will" but may "constitute evidence that, when considered in light of the totality of the circumstances, strongly weighs against the conclusion that the confession was voluntary." *Rettenberger*, 1999 UT 80 at ¶ 32, 984 P.2d 1009. In *Rettenberger*, the officers made repeated references to the defendant being charged with capital murder, its lethal consequences, and the possibility of lesser charges being brought if the defendant cooperated. *See id.* at ¶ 29, 984 P.2d 1009. The officers "strongly suggested" several times that the defendant would not face the death penalty if he confessed. *See id.* They further suggested the murder was unintentional thirty-nine times and the legal significance of the defendant's intent was made explicit. *See id.* at ¶ 31, 984 P.2d 1009.

¶ 24 Similar to the officers in *Rettenberger*, the detectives in the present case told Defendant that he was going to be charged with "premeditated, first degree murder" and stated that they did not believe Son's death was intentional or implied that he could avoid a premeditated murder charge if he offered an unintentional, negligent or reckless explanation for Son's death. However, unlike the officers in *Rettenberger*, the detectives in the present case did not make significant references to capital murder and its lethal consequences. Furthermore, unlike the defendant in *Rettenberger*, Defendant did not parrot the facts supplied by the detectives to avoid a charge, *see id.* at ¶ 40, 984 P.2d 1009, but provided his own version of events. Thus, we conclude that Defen-

dant's free will was not overcome by any threats or any suggestions of leniency.

¶ 25 Defendant also argues the detectives coerced incriminating statements with the false friend technique. In employing this technique, officials "represent[ ] to [a defendant] that they [are] his friends and that they [are] acting in his best interest." *Id.* at ¶ 24, 984 P.2d 1009. Standing alone, this technique is not "sufficiently coercive to produce an involuntary confession," but may be significant "in relation to other tactics and factors." *Id.* at ¶ 28, 984 P.2d 1009.

¶ 26 Although at the beginning of the interview, the detectives suggested that they would act on Defendant's behalf in going to the district attorney, the detectives did not explicitly tell Defendant that they were trying to help him and were trying to make him look good until after he made his admission about introducing Freon into Son's bathwater. Further, throughout the interview, Defendant did not merely accept the "false claims" against him. *See id.* In fact, he refused to parrot any suggestions that he murdered Son, pushed Son under the water, hit or shook Son, lost his temper, or staged the crime scene. Moreover, the trial court found that Defendant's psychological condition did not impair his ability to respond to the detectives' interrogation tactics. Thus, we conclude Defendant was not susceptible to the false friend technique, unlike the defendant in *Rettenberger*. *See id.* at ¶ 26, 984 P.2d 1009.

¶ 27 Defendant additionally argues the detectives intentionally played upon his vulnerable mental and psychological conditions to induce incriminating statements. "[A] confession may be suppressed in circumstances in which a police officer knows of a suspect's mental illness or deficiencies at the time of the interrogation and *effectively exploits* those weaknesses to obtain a confession." *Id.* at ¶ 18, 984 P.2d 1009 (emphasis added).

¶ 28 Defendant *focuses on the fact* that the detectives developed a psychological profile of him and then used interrogation tactics based on that profile. Psychological

profiling and interrogation based on that profiling are not fatal to an interrogation. Rather, the focus is on whether the interrogation was coercive. Furthermore, Defendant does not specifically challenge the trial court's conclusion that his psychological condition did not affect his ability to respond independently or appropriately to the detectives' questions. Nor does he in any way challenge the trial court's findings underlying its conclusion. The trial court specifically noted that nothing in the videotape suggested that Defendant was intoxicated or that his psychological condition was such that he was unable to respond appropriately or independently even when pressed by the detectives. Thus, we conclude the detectives' tactics did not exploit any known mental or psychological condition of Defendant.

### CONCLUSION

¶ 29 In sum, we agree with the trial court's conclusion that under the totality of the circumstances, neither Defendant's understanding nor his ability to exercise free will and make reasonable decisions as to how to respond to the detectives' questions were overcome by the detectives' tactics, Defendant's alcoholism, or any psychological condition, individually or combined. Thus, we affirm.

¶ 30 WE CONCUR: James Z. Davis and Pamela T. Greenwood, Judges.