2003 UT App 268

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jason WERNER, Defendant and Appellant.**

**No. 990942–CA.**

Court of Appeals of Utah.

July 25, 2003.

Rehearing Denied Aug. 21, 2003.

D. Richard Smith, Salt Lake City, for Appellant.

Mark L. Shurtleff and Christine Soltis, Asst. Attys. Gen., Salt Lake City, for Appellee.

Before BILLINGS, Associate P.J., GREENWOOD, and ORME, JJ.

## OPINION

BILLINGS, Associate Presiding Judge:

¶ 1 Jason Werner appeals his jury conviction for aggravated sexual assault, a first degree felony, in violation of Utah Code Annotated section 76-5-405 (1997). Werner asserts the district court erred in concluding his confession was not the involuntary product of police coercion, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. We affirm.

## BACKGROUND

¶ 2 On May 18, 1999, at about 9:50 a.m., Lisa Wentz was walking across the Cache Valley Mall parking lot in Logan, Utah, on her way to work. In the parking lot, a young man walked up to her and introduced himself as "Jason" and asked for her telephone number. When Lisa refused to give her number and attempted to walk away, the man grabbed her arm and pulled her towards a nearby movie theater. Lisa reported that the man threatened her, grabbed her breasts, and exposed his genitals. When the assailant was momentarily distracted by a passing car, Lisa was able to break free and run to safety. She reported the incident to her co-workers and the police were notified.

¶ 3 At about this same time, eyewitnesses in the adjacent theater dialed 911. They described the assailant as a white male driving an older model yellow or creme colored four-door automobile.

¶ 4 Logan police detectives began working the case immediately. Having had prior experience with Werner, Detective Rod Peterson put Werner under surveillance. Detective Peterson obtained photographs of Werner and a yellow automobile that he learned was owned by Werner's girlfriend. Detective Peterson later conducted a photo lineup where three eyewitnesses, in addition to the victim, picked Werner as the assailant. Two of these witnesses also picked Werner's girlfriend's car from a photo lineup.

¶ 5 Consequently, on May 27, 1999, at the police station, Detective Peterson questioned Werner about his involvement in the assault. The videotaped interrogation lasted approxi-

mately an hour and a half. Near the end of the interview, Werner confessed. Later at a suppression hearing, the district court heard arguments and viewed the videotaped interview in its entirety before finding that under the totality of the circumstances, "[Werner's] statement was voluntary ... [and without] impermissible coercion." At a subsequent jury trial, Werner was convicted of aggravated sexual assault and sentenced to an indeterminate term of ten years to life in prison. Werner appeals his conviction on grounds that the district court erred in admitting his taped confession into evidence.

## ISSUE AND STANDARD OF REVIEW

¶ 6 Werner contends the district court erred in denying his motion to suppress and ruling that his confession was not involuntarily obtained through coercive police conduct. "In 'reviewing a trial court's determination on the voluntariness of a confession, we apply a bifurcated standard of review.' " *State v. Rettenberger*, 1999 UT 80, ¶ 10, 984 P.2d 1009 (quoting *State v. Mabe*, 864 P.2d 890, 892 (Utah 1993)). "Under the bifurcated standard, the ultimate determination of whether a confession is voluntary is a legal question, and we review the trial court's ruling for correctness." *Mabe*, 864 P.2d at 892 (citing *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991)). But "[t]o the extent the trial court has made subsidiary factual findings, ... those findings will not be set aside unless they are clearly erroneous." *Id.* (citing *State v. Thurman*, 846 P.2d 1256, 1271 (Utah 1993)).

## ANALYSIS

### I. Miranda Warning

¶ 7 As a preliminary matter, Werner suggests that prior to questioning, Detective Peterson made statements to Werner "which vaguely recited the essence of the *Miranda*[1] warning." "While *Miranda* is recognized as obligating police to follow certain procedures in their dealings with an accused, the decision did not prescribe that

---

1. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

law enforcement officers adhere to a verbatim recitation of the words of the opinion." *State v. Strain*, 779 P.2d 221, 223 (Utah 1989). So long as the substance of Werner's *Miranda* warning, given " 'prior to any questioning[,]' " indicated to Werner " 'that he ha[d] the right to remain silent, that anything he sa[id could] be used against him in a court of law, that he ha[d] the right to the presence of an attorney, and that if he [could not] afford an attorney one [would] be appointed for him prior to any questioning if he so desire[d],' " *id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966)), then the warning was sufficient, regardless of its specific wording. "With this in mind, we examine the *Miranda* warning given to [Werner] upon his arrest." *Id.*

¶ 8 At the time of Werner's arrest, the following exchange ensued between Werner and Detective Peterson:

> Peterson: I need to make sure you understand what your rights are and all that. You don't have to talk to me if you don't want to. You can decide at any time to stop answering any questions I ask you. You can have an attorney present. And if you can't afford to hire one the court will appoint one for you.... And you can go any of those routes at any time. You do understand all of that?

> Werner: Yeah.

> Peterson: And anything we talk about today may be used against you in court when we get to that point, okay?

> Werner: Yeah.

In his own words, Detective Peterson clearly covered every necessary component of an adequate *Miranda* warning.

### II. Failure to Marshal the Evidence

¶ 9 The State raises a second preliminary issue, contending we should not consider Werner's challenge of the district court's ruling that his confession was voluntary "because [Werner] failed to marshal the evidence in support of the trial court's ruling."[2]

---

2. In support of this assertion, the State cites *Neely v. Bennett*, 2002 UT App 189, ¶ 11, 51 P.3d 724, *cert. denied*, 59 P.3d 603 (Utah 2002), and

¶ 10 The voluntariness of a confession is a legal determination and marshaling is not required. In *State v. Rettenberger*, our supreme court stated with no equivocation that

> [i]n "reviewing a trial court's determination on the voluntariness of a confession, we apply a bifurcated standard of review." *State v. Mabe*, 864 P.2d 890, 892 (Utah 1993). The ultimate determination of voluntariness is a legal question; accordingly, we review the district court's ruling for correctness. *See id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). We set aside a district court's factual findings only if they are clearly erroneous. *Id.*

1999 UT 80, ¶ 10, 984 P.2d 1009.[3]

¶ 11 In sum, a district court's "ultimate determination of voluntariness," *State v. Bunting*, 2002 UT App 195, ¶ 12, 51 P.3d 37 (quotations and citation omitted), after having made "underlying factual findings," *State v. Thurman*, 846 P.2d 1256, 1270 (Utah 1993), "is a legal question that we review for correctness," *Bunting*, 2002 UT App 195 at ¶ 12, 51 P.3d 37 (quotations and citations omitted), and no marshaling is required of an appellant challenging the ultimate legal determination of voluntariness of a confession on appeal.

### III. Voluntariness of Confession

¶ 12 Werner contends the district court erred in admitting "incriminating statements he made during the interview [with police, which] were the involuntary product of coercion, violating his right to due process under the Fourteenth Amendment and right to protection from compelled self-incrimination under the Fifth Amendment [to] the United States Constitution." *State v. Bunting*, 2002 UT App 195, ¶ 12, 51 P.3d 37.

¶ 13 "The Fifth Amendment ' "protects individuals from being compelled to give evidence against themselves." ' " *Id.* at ¶ 14 (quoting *State v. Rettenberger*, 1999 UT 80, ¶ 11, 984 P.2d 1009 (quoting *State v. Piansiaksone*, 954 P.2d 861, 865 (Utah 1998))) (other quotations and citation omitted). "[U]nder the Due Process Clause of the Fourteenth Amendment, ' "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." ' " *Id.* (quoting *Rettenberger*, 1999 UT 80 at ¶ 11, 984 P.2d 1009 (quoting *Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 519, 93 L.Ed.2d 473 (1986))) (other quotations and citation omitted).

¶ 14 When the voluntariness of a confession is challenged, the Fifth and Fourteenth Amendments "require ' "the prosecution to demonstrate by a preponderance of the evidence that the statement was made voluntarily." ' " *Id.* (quoting *Rettenberger*, 1999 UT 80 at ¶ 45, 984 P.2d 1009 (quoting *State v. Allen*, 839 P.2d 291, 300 (Utah 1992))). "In assessing such a challenge, a

---

rule 24(a)(9) of the Utah Rules of Appellate Procedure. Neither is helpful. Rule 24(a)(9) merely states the now axiomatic principle in Utah law that "[a] party challenging a fact finding [on appeal] must first marshal all record evidence that supports the challenged *finding*." Utah R.App. P. 24(a)(9) (emphasis added). *Neely* is a civil case involving a personal injury suit arising from an automobile accident. *See* 2002 UT App 189 at ¶¶ 3–7, 51 P.3d 724. In that case, we held that "[w]hen an appellant challenges a trial court's ruling concerning either a motion for a directed verdict, or a motion for additur or new trial, the appellant is obligated to first 'marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict.' " *Id.* at ¶ 11 (quoting *Brewer v. Denver & Rio Grande W.R.R.*, 2001 UT 77, ¶ 33, 31 P.3d 557). Neither of these authorities support the State's assertion that a criminal appellant's challenge of a district court's determination of the voluntariness of a confession requires the appellant to marshal the evidence.

3. On a related note, it is well-settled law that "[i]n the face of a challenge to the voluntariness of a statement or confession, it is incumbent upon the prosecution to demonstrate by a preponderance of the evidence that the statement was made voluntarily based upon the totality of the circumstances." *State v. Allen*, 839 P.2d 291, 300 (Utah 1992); *accord State v. Rettenberger*, 1999 UT 80, ¶ 45, 984 P.2d 1009. If an appellant who challenges the district court's voluntariness determination on appeal is forced to meet the marshaling requirement in making that challenge, the burden to prove voluntariness based upon the totality of the circumstances is impermissibly shifted from the State to the challenger.

trial court 'must examine the "totality of circumstances to determine whether" ' a statement was ' "made freely, voluntarily and without compulsion or inducement of any sort." ' " *Id.* (quoting *Rettenberger*, 1999 UT 80 at ¶ 14, 984 P.2d 1009 (quoting *Withrow v. Williams*, 507 U.S. 680, 689, 113 S.Ct. 1745, 1751, 123 L.Ed.2d 407 (1993))) (other quotations and citation omitted).

¶ 15 For a court to find that a confession is involuntary, " ' "[e]vidence to support [that] finding ... must reveal some physical or psychological force or manipulation that is designed to induce the accused to talk when he otherwise would not have done so." ' " *Id.* (quoting *Rettenberger*, 1999 UT 80 at ¶ 25, 984 P.2d 1009 (quoting *State v. Hegelman*, 717 P.2d 1348, 1350 (Utah 1986))). In addition, "[t]here must ' "also be a causal relationship between the coercion and the subsequent confession." ' " *Id.* (quoting *Rettenberger*, 1999 UT 80 at ¶ 18, 984 P.2d 1009 (quoting *State v. Mabe*, 864 P.2d 890, 893 (Utah 1993))). " 'In other words, the evidence must show that the coercive tactics ... overcame the defendant's free will.' " *Id.* (quoting *State v. Galli*, 967 P.2d 930, 936 (Utah 1998)).

¶ 16 We factor into our totality of the circumstances analysis considerations such as " 'the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers.' " *Id.* at ¶ 15 (quoting *Rettenberger*, 1999 UT 80 at ¶ 15, 984 P.2d 1009). "Other factors to consider include 'the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system.' " *Id.* (quoting *Rettenberger*, 1999 UT 80 at ¶ 20, 984 P.2d 1009).

¶ 17 Finally, "[t]he constitutional standard for determining the voluntariness of a confession requires that we independently review the entire record." *Mabe*, 864 P.2d at 892. With all these principles in mind, we examine the circumstances of Werner's confession to Detective Peterson.

## A. Werner's Background

¶ 18 Werner was approximately twenty-five years old at the time of the interview. He is a high school drop-out with an extensive criminal record. He was incarcerated as a juvenile and then later as an adult. He served over two years in the Utah State Prison. Subsequent parole violations resulted in more prison time. In sum, Werner has had significant experience with the criminal justice system. Werner does not assert, and we cannot find in the record, any evidence of mental illness or emotional instability that would render him vulnerable to police interrogation tactics. Also, prior to the interview, Detective Peterson had dealt with Werner on numerous occasions in connection with other alleged criminal activities. Essentially, the interview took place between two people who knew each other.

¶ 19 In sum, we are not dealing with a vulnerable defendant, but rather one experienced with the criminal justice system in general, and with Detective Peterson in particular.

## B. False Friend Technique

¶ 20 This court has previously stated that "[s]tanding alone, [the false friend] technique is not sufficiently coercive to produce an involuntary confession, but may be significant in relation to other tactics and factors." *State v. Bunting*, 2002 UT App 195, ¶ 25, 51 P.3d 37 (quotations and citation omitted). In requesting that we reverse the district court's determination that his confession was voluntary, Werner contends that "[t]he circumstances in the instant case are identical to the *Rettenberger* case so far as the coercive effect the false friend technique ... had upon [Werner]." We disagree.

¶ 21 The interrogation transcript in this case reveals that Detective Peterson employed the false friend technique. The following is representative of Detective Peterson's use of the technique:

> Peterson: And that's why I come to you. That's why I grabbed this case, because, okay, I know Jason, I know Jason. I'll work that one. Let me get ahold [sic] of Jason and I'll work with him. So that's how everything kind of ended up on my

lap you know. If you have questions, or whatever, let's just be open with each other and talk.

And later,

Peterson: Just because this is my job doesn't mean I'm inhuman.... That's why when this case surfaced I said give it to me, I'll go talk to Jason.... That's not Rod the policeman, that's Rod the human. So don't think I'm being insensitive and I'm sarcastic or anything like that. I'm not being that, okay. I'm being frank with you, being honest with you. I'm telling you the way it is.... I understand and know the position that you're in. You're scared, you're worried, You're an ex-con.... Tell me something, Jason. Tell me something that makes it not a first degree. Tell me your side.

¶ 22 In *State v. Rettenberger,* 1999 UT 80, 984 P.2d 1009, the Utah Supreme Court reversed the district court's denial of the defendant's motion to suppress his confession, concluding that under the totality of the circumstances, police coercion rendered the confession involuntary. *See id.* at ¶ 45. The police in that case employed, among other techniques, the false friend technique to elicit a confession from a mentally-challenged eighteen-year-old defendant. *See id.* at ¶ 24. The defendant had never previously been arrested or interrogated by police. *See id.* at ¶ 2.

¶ 23 At the suppression hearing, expert testimony established that the defendant suffered from Attention Deficit Disorder, a below average I.Q., and had the maturity level of a fifteen-year-old. *See id.* at ¶ 6. He also showed signs of "depression, anxiety disorder, thought disorder, schizophrenia, and Dependant Personality Disorder." *Id.* In addition, the district court found that at the time of arrest and interrogation, the defendant was "under extreme stress and anxiety ... and was afraid of the death penalty." *Id.* at ¶ 7.

¶ 24 Noting that the defendant's "interrogation took place in yet a larger context of deception," *id.* at ¶ 24, the *Rettenberger* court held that

[t]o the extent that [the defendant] suffers from mental disabilities and deficiencies, and to the extent that he believed the officers were protecting his best interests [because of the false friend technique], he was less likely to question the false claims about the evidence against him; was less likely to clearly invoke his right to counsel or to remain silent; was more likely to "parrot" back the details the officers suggested, whether or not they were true; was more likely to place stock in any promises or threats that the officers made, however ambiguous they might be; and was more likely to confess, whether guilty or innocent.

*Id.* at ¶ 28.

¶ 25 However, in *Bunting,* where the defendant lacked any "psychological condition [that would] impair his ability to respond to the detective's interrogation tactics," we concluded the "[d]efendant was not susceptible to the false friend technique." 2002 UT App 195 at ¶ 26, 51 P.3d 37. We think this case more closely resembles *Bunting.*

¶ 26 As noted above, at the time of his arrest and interrogation, Werner was twenty-five years old, had an extensive criminal record, and had served over two years in the Utah State Prison. In an attempt to analogize his mental condition with that of the defendant in *Rettenberger,* Werner points out that "it was noted in the pre-sentence report ... that [Werner] had learning disabilities, and despite a high I.Q., he functioned at below average levels." We fail to see the similarities between Werner and the defendant in *Rettenberger.* Learning disabilities and below-average levels of functioning do not equate with the kinds of mental disabilities that rendered the defendant in *Rettenberger* susceptible to the false friend technique.

¶ 27 While we agree that the false friend technique can be coercive in some circumstances, we conclude it was not in this case.

C. Misrepresentations Regarding Incriminating Evidence

¶ 28 Next, Werner contends that his confession was involuntary because Detective Peterson misrepresented the strength and

the quantity of evidence the police had gathered against him.

¶ 29 Both federal and Utah cases "have recognized that [a] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *State v. Rettenberger*, 1999 UT 80, ¶ 20, 984 P.2d 1009 (alteration in original) (quotations and citations omitted); *see also Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969) ("[W]hile relevant, [the police misrepresentations are] insufficient in our view to make this otherwise voluntary confession inadmissible."); *United States v. Harris*, 914 F.2d 927, 933 (7th Cir.1990) ("[I]t is well settled that police may use small deceptions while interrogating witnesses."); *State v. Galli*, 967 P.2d 930, 936 (Utah 1998) ("While the detectives' half-truths regarding the strength of the evidence against [defendant] should not be condoned, we are not convinced that this was sufficient to overcome his free will and spirit." (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994))). Nonetheless, " 'in certain cases, police misrepresentations may be sufficiently egregious to overcome a defendant's will so as to render a confession involuntary.' " *State v. Bunting*, 2002 UT App 195, ¶ 16, 51 P.3d 37 (quoting *Rettenberger*, 1999 UT 80 at ¶ 20, 984 P.2d 1009).

¶ 30 Werner claims coercion resulted when Detective Peterson informed Werner there was "overwhelming evidence against him" and when, on two different occasions during the interview, Detective Peterson told Werner that police were in possession of mall surveillance tapes that contained footage of Werner at the scene.[4] In fact, no such footage existed.

¶ 31 We certainly do not condone the video tape hoax. In fact, it is this element which makes this case a close call. However, we note that both references to the nonexistent video tape occurred early in the interview and that Werner's confession did not occur until the latter stages of the questioning,

suggesting that the misrepresentations did not overcome Werner's free will and yield a confession.

¶ 32 Furthermore, there was significant other evidence of Werner's guilt, including three eyewitnesses supporting Detective Peterson's claim of "overwhelming" evidence. On the whole, we are not convinced that Detective Peterson's misrepresentation concerning the nonexistent mall video surveillance footage was "sufficiently egregious to overcome [Werner's] will so as to render [his] confession involuntary" in this case. *Bunting*, 2002 UT App 195 at ¶ 16, 51 P.3d 37.

### D. Denying Access to Telephone and Outside People

¶ 33 Werner asks us to consider the potentially coercive effect of Detective Peterson's denials of Werner's requests to speak to his girlfriend, either in person or on the telephone.

¶ 34 In *State v. Rettenberger*, 1999 UT 80, 984 P.2d 1009, our supreme court, in reversing the denial of a motion to suppress his confession, noted that although the defendant "made several requests to call his mother" during an interrogation, "he was not" allowed to "use the telephone" "or to call his mother." *Id.* at ¶ 35. However, this was but one of many "factors ... weigh[ing] against the State's claim that the confession was voluntary." *Id.; cf. State v. Bolsinger*, 699 P.2d 1214, 1217–18, 1217 n. 2 (Utah 1985) (finding no coercion where the facts showed that police did not attempt to contact a lawyer for the defendant until an hour after defendant requested one and eventually stopped trying after unsuccessfully trying to contact one lawyer).

¶ 35 We do not believe that Detective Peterson's repeated denials of Werner's requests to speak to his girlfriend render involuntary an otherwise voluntary confession.

### E. Threats of Harsher Penalties and Promises of Leniency

¶ 36 Werner maintains that his confession was involuntarily obtained through

---

4. Detective Peterson explained at trial that during the interview he had placed a blank video tape marked "Mall Security of Jason in the Parking Lot" in the interview room "to see what [Werner's] reaction would be" and to get "an idea as to whether or not we for sure had the right individual."

police coercion because Detective Peterson threatened Werner with harsher penalties unless he confessed and promised Werner leniency in exchange for his cooperation during the interview.

¶ 37 Our supreme court has held that "[t]he mere representation to a defendant by officers that they will make known to the prosecutor and to the court that he cooperated with them, ... or appeals to the defendant that full cooperation would be his best course of action, [are] not coercive." *State v. Strain*, 779 P.2d 221, 225 (Utah 1989). However, the supreme court has also held that "most courts have found a confession involuntary where [there was] a threat to pursue a higher charge if the accused did not confess." *Id.* at 226; *accord State v. Rettenberger*, 1999 UT 80,¶ 29, 984 P.2d 1009 ("We have recognized that an interrogation can be impermissibly coercive because [it] carried a threat of greater punishment ...." (quotations and citation omitted)).

¶ 38 Nonetheless, "the important question ... is not whether the ... interview was impermissibly coercive, but whether the coercive [threats] employed by [Detective Peterson] overcame [Werner's] free will, causing him to confess." *State v. Mabe*, 864 P.2d 890, 893 (Utah 1993).

¶ 39 In *Strain,* in addition to threatening defendant with a first degree murder charge and possible execution if convicted, the police also made the defendant a promise of leniency in the form of a personal guarantee. *See* 779 P.2d at 226. The *Strain* court held that the officer "crossed the line when he offered defendant a promise as evidenced by his personal guarantee." *Id.* at 226.

¶ 40 During the interview between Detective Peterson and Werner, the following exchange ensued:

Werner: I think you guys already have the charge. You should just tell me. I think you already know what you're—

Peterson: I do know. I already told you. The county attorney is going to say, Rod, book him on a first degree felony. If Jason wants to play hardball, we'll play hardball.

Werner: You're saying that's what he's going to say.

Peterson: I don't know yet. If we stop right now, if we stop right now, we both walk out that door, it will be a first degree felony, Jason, *I guarantee it. I guarantee it because that's all I've got.* I only have her side of the story. She's told me Jason committed a first degree felony. That's what she's told me.... *If I can't get you to talk to me and tell me your side of the story I'm going to book you on a first degree felony.*

(Emphasis added.)

¶ 41 Detective Peterson also insinuated that Werner could obtain leniency in exchange for a confession:

Peterson: Tell me something, Jason. Tell me something that makes it not a first degree. Tell me your side.

Werner: A first or second, it don't matter.

Peterson: Tell me something that makes it not a first or second degree felony. Tell me something—

¶ 42 We note, however, that like the defendant in *State v. Miller*, 829 P.2d 132 (Utah Ct.App.1992), Werner "may have actually initiated and solicited the promise[s of leniency,]" *id.* at 135, by repeatedly asking Detective Peterson how severe the charges were going to be.

¶ 43 We find troublesome Detective Peterson's threats of more serious charges and inferences of leniency if Werner's side of the story was told. However, under our totality of the circumstances analysis, they do not render Werner's confession involuntary.

### F. Other Factors

¶ 44 We note that in the early stages of the interview, Werner denied involvement in the crime over twenty times. However, once he did confess, he did not merely " 'parrot' back" details suggested by Detective Peterson. *State v. Rettenberger*, 1999 UT 80,¶ 28, 984 P.2d 1009. Instead, Werner added significant details in his confession that only he could have supplied.

¶ 45 Finally, "[t]o the extent the trial court has made subsidiary factual findings, ... those findings will not be set aside unless

they are clearly erroneous." *State v. Mabe*, 864 P.2d 890, 892 (Utah 1993). At the suppression hearing, the district court judge orally made the following findings after viewing the videotaped confession:

> Judge: This court finds the overall totality of the circumstances are not impermissibly coercive. Specifically, *it was not a coercive environment.* In fact, to the contrary, this court would find that based upon the videotape[d interview], a review [of] the transcript, that *there was no coercive demeanor used by Detective Peterson. The length of the interview was not overly burdensome.* Certainly not compared to those cited in the cases. The interview could have stopped at any time at the request of the defendant. In fact, *I thought that the interview was conducted in a [very] humane fashion* where that kind of request by the defendant could have been made at any time and presumably been honored.
>
> *The resulting statement was not based upon promises, guarantees or threats. Nor did it follow any suggestions made by Detective Peterson.* Even after the first admission by the defendant that he was there, that he in fact did not intend to harm the victim in any fashion, Mr. Peterson suggested perhaps some scenarios, even those were not followed in the resulting colloquy. The statements made by the defendant were voluntarily initiated by himself relative to that.
>
> . . . .
>
> *Overall the interview was not confrontational.* In fact, I thought the overall demeanor was one of mild urging. I didn't find any sarcasm. I thought *the interview was conducted in a warm and humane fashion,* readily distinguishable from both *Strain* and *Mabe* in a number of aspects.

These subsidiary findings made after the district court judge viewed the entire videotape of the interrogation help to persuade us that Werner's confession was voluntary.

## CONCLUSION

¶ 46 At the time of his arrest, Werner was twenty-five years old, had an extensive criminal record, and had been incarcerated both as a juvenile and as an adult. Werner was experienced in dealing with the criminal justice system and was already acquainted with the interviewer, Detective Peterson. Prior to questioning, Werner received an adequate *Miranda* warning. While Detective Peterson did employ various methods of deception and other inappropriate interrogation tactics, Werner's will was not overcome and his confession provided information that only Werner could have known. Viewing all of the foregoing under the totality of the circumstances, we conclude Werner's confession was voluntary.

¶ 47 Affirmed.

¶ 48 WE CONCUR: PAMELA T. GREENWOOD and GREGORY K. ORME, Judges.