2024 UT App 9

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ALAVINA FUNGAIHEA FLORREICH,
Appellant.

Opinion
No. 20200255-CA
Filed January 19, 2024

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 181903863

Robert Denny, Attorney for Appellant

Sean D. Reyes, William M. Hains, and Emily Sopp,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES
GREGORY K. ORME and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1 At the close of a four-day trial, a jury convicted Alavina Florreich of five counts of aggravated sexual abuse of a child and two counts of forcible sexual abuse. On appeal, Florreich raises twelve claims of ineffective assistance of counsel, and she also moves for a remand under rule 23B of the Utah Rules of Appellate Procedure to develop a record to support two additional ineffective assistance claims. For the reasons set forth below, we deny the motion for a remand and affirm Florreich's convictions.

BACKGROUND[1]

*Sexual Abuse and Investigation*

¶2     From 1998 to 2009, Alavina Florreich was the nanny for Alex[2] and his siblings. Florreich is a Tongan immigrant, and Alex and his siblings were the homeschooled children of a Jewish rabbi.

¶3     When Alex was eight years old, Florreich was watching a movie with Alex and his younger siblings one day when Alex began giving her a shoulder massage. While doing so, Alex slipped his hand beneath Florreich's shirt. Florreich then took Alex's hand and guided it to her breast. At the time, Florreich was 50 years old.

¶4     Over the ensuing months and years, Florreich and Alex had a sexual relationship of increasing intimacy. Sometime after the initial incident, Florreich asked Alex if he wanted to see what was under her shirt. When Alex said that he did, Florreich lifted up her shirt. Alex occasionally asked her to do this again, and she often (though not always) obliged. On one occasion, Alex became upset when Florreich accidentally disconnected a video game that he was playing with his brothers. Florreich told Alex to meet her in the bathroom in a few minutes and that she "would make it

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

2. Despite the wide publicity surrounding this case, we'll adhere to our general practice of referring to victims of sexual abuse pseudonymously.

right." When Alex arrived, Florreich was standing in her underwear. "Enjoy it," she said.

¶5     Florreich soon began asking Alex to touch her breasts. Most of these encounters took place in a downstairs bathroom. On one occasion, this occurred in the upstairs bedroom of Alex's baby sister. When the two heard the door opening and realized that it was Alex's mother, Florreich called out that she was changing clothes, and without realizing what had been occurring inside the room, Alex's mother shut the door.

¶6     Florreich eventually began urging Alex to expose himself to her. When Alex was 10 or 11, Florreich touched Alex's penis for the first time. Alex later recalled that "her face lit up," that she told him that he was "so healthy," and that she made comments about the size of his penis. Sometime afterward, Florreich stroked Alex's penis to ejaculation, and this same thing occurred on many other occasions moving forward. When Alex was 13, he left the state for boarding school. Florreich remained employed with his family. When Alex would return home for breaks, the two would again engage in sexual contact, including one instance in which Florreich caused Alex to ejaculate by stroking his penis with her feet.

¶7     Their last sexual encounter occurred in 2009, which was shortly after Alex turned 18. According to Alex's subsequent account of this encounter, Florreich offered to perform oral sex on him and then did so, and this was the first time this particular act had occurred.

¶8     Alex later estimated that over the 10-year period that began when he was 8 and lasted until he was 18, he and Florreich had somewhere between 100 and 200 sexual encounters. But Alex had not yet told anyone about these encounters. In 2016, however, Alex saw an episode of a popular TV drama that depicted a nanny's sexual abuse of a child. Alex later explained that the

episode's framing helped him realize that children cannot consent to sexual activity with adults, regardless of how willing the child might have been to engage in the behavior. Alex began seeing a therapist and soon told his therapist what had happened with Florreich. After that, Alex told his wife, his parents, and, finally, the police.

¶9 After Alex reported the abuse to police, the detective who was managing his case (Detective) set up a recorded pretext call between Alex and Florreich. The first portion of the call was mostly small talk; during this portion, Florreich repeatedly had trouble hearing Alex, though the audio issues resolved when Alex moved closer to his phone and Florreich connected her phone to a speaker. As the call progressed, Alex then lied to Florreich about the real purpose for his call. Alex told her that he was having sexual troubles with his wife and that he was hoping Florreich could counsel him through those troubles by discussing their own past encounters.

¶10 During the ensuing discussion, Florreich repeatedly agreed that there had been sexual contact between them. For example, Florreich said that she had been impressed with the size of Alex's penis, and she confirmed that she had massaged his penis to the point of ejaculation with her feet on one occasion. Florreich also recalled the first time that Alex had ejaculated into her hand, recalling that she had told him that his future wife would be "very lucky" because "some people don't get that, you know?" Florreich then reminded Alex of her own comment that he was "very healthy," and she asked him if he was "still the same." Florreich also said that she had "sweet memories" about massaging Alex's penis, and she told him that "with those memories, I am able to be with [my husband] to this day." At one point in the conversation, Alex vaguely referenced "some of our, you know, experiences when I was a kid" that involved Florreich "preparing me for marriage," at which point Florreich interjected, "with your curiosity, right?" Florreich agreed that what they had

done was "kind of like preparing you for your marriage life," and she asked Alex whether he thought about her while he was touching his wife. During this call, the only sexual encounter that Alex mentioned that Florreich denied was his memory that his mother had once almost walked in on them while they were in his baby sister's room.

¶11    A day or two later (the record is slightly unclear on which), detectives knocked on Florreich's door and asked her to come to the police station for an interview. After reading Florreich her *Miranda* rights, detectives asked her about the phone conversation she'd had with Alex. Florreich then backtracked on several of the admissions she had made in that call, telling detectives that she "didn't mean" some of what she said. But even so, Florreich still admitted to at least some sexual contact, including that she had touched Alex's penis starting around the age of 12 or 13. Florreich said that she hadn't wanted to do it but that Alex had "made" her. When a detective asked about the alleged oral sex encounter that occurred after Alex turned 18, Florreich suggested that Alex had "made" her do it and that it was "rape." Throughout this interview, Detective was often combative with Florreich, he frequently accused Florreich of lying, and he insisted that Alex had been honest when making his accusations.

*Charges and Trial*

¶12    The State charged Florreich with five counts of aggravated sexual abuse of a child and two counts of forcible sexual abuse. A four-day jury trial was held. In his opening statement, defense counsel (Counsel)[3] said, "Both sides are going to try to make sense of the other side's story, and we're going to try to present to you

---

3. Florreich was represented by two attorneys below. We refer to them with the singular "Counsel" for convenience.

the facts in a light that shows you what our point of view in the case is. And nobody is going to lie to you on this case."

¶13 The State called three witnesses in its case: Alex, Alex's mother, and Detective. Alex testified at length about the details of his sexual relationship with Florreich that were recounted above. Alex also testified to feeling intense, religiously inflected guilt about what had occurred. Alex said that he became "secretive and sneaky" during those years, simultaneously hoping the sexual contact would continue while also wishing it would stop. He admitted that, after the pattern of sexual contact was first established, he often initiated the encounters and that Florreich had refused him on "numerous occasions." Alex's mother testified that Florreich spoke English "perfectly" and had not been a pushover for the kids. She also testified that the family had a great relationship with Florreich and that she was shocked to learn about the alleged abuse. She said she never observed any inappropriate sexual activity between Florreich and any of her children. In his direct examination, Detective testified about his involvement in the case, including the circumstances surrounding the pretext call and the interrogation.

¶14 The State also played audio of both the pretext call and Florreich's interrogation for the jury. While playing these recordings, the prosecutor (Prosecutor) skipped past parts of the recording where the conversation had veered into irrelevant topics.

¶15 At one point while playing the recording of the interrogation, the jury heard a brief exchange in which Detective had begun to discuss a story Florreich had told Alex about an instance in which she had sex with a man in a park. Prosecutor stopped the audio, approached the bench, and suggested that she had inadvertently played this exchange. Prosecutor asked for permission to skip over the rest

of the story, saying that it was not relevant and was potentially prejudicial to Florreich. Counsel protested, initially saying "we should listen to the whole thing" and then obtaining assurances from the court that he would be allowed to play the whole video under the rule of completeness. Prosecutor did not play the audio of the rest of that story, and in his own case, Counsel did not either.

¶16   During the defense's case, Counsel's primary theme was that Alex had "threatened" or even "forced" Florreich into performing the sexual acts and that Florreich had only complied out of fear for her job and because she didn't want to "ruin" his life. In support, Counsel highlighted the oral sex incident and Florreich's claim that Alex had forced her into engaging in the conduct. He also pointed to various statements from Alex in which he admitted that he had initiated many of their sexual encounters and that he was sometimes very determined that the encounters should continue. Counsel argued that, to Alex, Florreich was "nothing more than a target, an object, something that can be used."

¶17   Counsel advanced this theme throughout his questioning of various witnesses. While cross-examining Alex's mother, for example, Counsel attempted to get her to admit that she had disparaged Florreich's intelligence and had said that Florreich was "easily manipulated" by the children, but Alex's mother did not recall making either statement. Counsel also asked Alex's mother whether Florreich was "a religious woman," which elicited testimony that Florreich had left the "Mormon faith" because she thought "it was better for the family," as well as testimony that she had joined another church.

¶18   During his cross-examination of Alex, Counsel again pursued his theme by asking Alex whether he had pressured Florreich into engaging in sexual activity. He also asked Alex about statements he made to police that suggested he had

initiated or controlled the sexual encounters.[4] In addition, Counsel highlighted certain discrepancies between Alex's testimony in direct examination and his past statements to Detective. In the most relevant example, Alex had told Detective that his mother had "walked into the room" during the encounter in his baby sister's room, whereas in the pretext call with Florreich and again at trial, Alex had said that the "door began to open" but that his back was facing the door and that he did not actually know how far his mother had come into the room. Finally, Counsel asked Alex a series of questions suggesting that Alex wanted to become a public figure on the issue of sexual abuse, highlighting his decision to give a couple of interviews about his allegations and about his contact with Elizabeth Smart, a well-known survivor of kidnapping and sexual assault.

¶19    As part of the defense case, Counsel also argued that while investigating the case, Detective had been too accepting of Alex's claims and too hostile toward Florreich. During cross-examination, Counsel pressed Detective about his various statements to Florreich during the interrogation in which he told her he thought she was lying. Counsel asked Detective how many times he had called her a liar, tried to get Detective to agree that accusing her of lying was an interrogation technique, and implied that Detective had failed to investigate Florreich's "rape" allegation because he had already come to a conclusion about who was telling the truth.

¶20    During this cross-examination, Detective repeatedly defended his own conduct. At one point, Detective said, "I called her a liar a lot because she lied a lot." At another point in this

---

4. At one point during the trial, Counsel disagreed with the trial court's suggestion that he was arguing "force or coercion." Counsel explained that his strategy was intended to negate the mens rea of the charges.

cross-examination, Counsel appeared to agree with Detective that Florreich had lied about some things:

> **Counsel:** You did investigate her allegations of rape, though?
>
> **Detective:** And look how many times she lied before she made that accusation.
>
> **Counsel:** Well, that's true—

While responding to questions from Counsel, Detective also repeatedly referred to Alex as a "victim."[5] And in two instances, Detective accused Counsel of trying to mislead the jury.

¶21    In the defense's case-in-chief, the only witness that Counsel called was a former employer of Florreich's (Employer). Counsel asked Employer about a jewelry theft involving a cleaning lady whom she had hired on Florreich's recommendation. Before Employer could get too far into the story, Prosecutor objected based on relevance. The objection was sustained, thus cutting off the story. At that point, Counsel then asked Employer for her opinion of Florreich's reputation for honesty or trustworthiness. She responded, in relevant part, "I think she is very honest. I think she's very trustworthy." On cross-examination, Prosecutor asked Employer if her opinion of Florreich's trustworthiness would change if she knew that Florreich "admitted that she touched the penis of a young boy more than one time in order to teach him about sex." Employer responded, "I would say yes"—though in response to subsequent questioning, Employer expressed doubt over whether she would believe Florreich's admission.

---

5. On at least one occasion, Prosecutor referred to Alex as a victim as well.

¶22    In his closing argument, Counsel focused on several key themes. First, Counsel claimed that, during his in-court testimony, Alex had exaggerated the number of incidents that could have occurred during Alex's childhood—that it was "absurd" to claim that Florreich could have touched him as often as Alex was now claiming without others in the household noticing. Second, Counsel argued that Alex had improperly manipulated police into targeting Florreich for investigation because of Alex's desire for publicity and notoriety. Third, Counsel focused heavily on Florreich's claim that Alex had "coerced" her into performing oral sex on him after he turned eighteen, claiming that Alex had "threat[ened]" her into doing so and that she should be viewed as a "victim." Fourth, Counsel stressed Florreich's background, pointing out that she was a Tongan immigrant, that "English is her second language," and that she had been described as kind and "truthful" and "laid back." Finally, turning to the incidents that Florreich had seemingly acknowledged in the pretext call and interrogation, Counsel pointed out that the charged offenses were "specific intent crime[s]" for which Florreich could be convicted only if she had "the specific intent to gratify [Alex] sexually." Counsel then argued that because Alex was her employer's child—and, by Alex's own admission, the initiator of many of the incidents—Florreich's "intent [was] to survive," as opposed to having an intent to "cause him sexual arousal." And in any event, Counsel also argued that because Florreich was Alex's nanny, any touching of his penis was akin to a mother touching a child's penis, which Counsel suggested should be viewed as non-sexual. From all of this, Counsel argued that Florreich "never had the intent to do anything to cause [Alex] sexual arousal" and that the jury should conclude that there was "reasonable doubt" that she had committed the charged crimes.

¶23    During closing argument, Counsel also briefly discussed the moment from Prosecutor's cross examination of Employer wherein Employer admitted that her opinion of Florreich might

change if she knew that Florreich had engaged in sexual conduct with a young boy. In an apparent attempt to suggest that this "what if" did not negate Employer's previously positive assessment of Florreich's character, Counsel said: "If I knew you were Hitler, that would change my opinion about you too, right? But from what I know[,] the most kind, loving person . . . has [been] described."[6]

¶24    At the close of trial, the jury convicted Florreich on all counts. Florreich timely appealed.


ISSUES AND STANDARD OF REVIEW

¶25    Florreich raises twelve claims of ineffective assistance of counsel. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law." *State v. Calata*, 2022 UT App 127, ¶ 13, 521 P.3d 920 (quotation simplified), *cert. denied*, 525 P.3d 1268 (Utah 2023).


ANALYSIS

¶26    Florreich raises twelve ineffective assistance claims, and she also asks for a rule 23B remand to develop a record on two additional claims of ineffective assistance. To succeed on any of her ineffective assistance claims, Florreich must establish both elements set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). First, she "must show that counsel's performance was deficient," and second, she "must show that the deficient performance prejudiced the defense." *Id.* at 687. "Both elements must be present, and if either is lacking, the

---

6. During a sidebar that occurred a short time later, the district court mentioned this analogy and ordered Counsel to "not use the word Hitler again."

claim fails and the court need not address the other." *State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031.

¶27  To establish deficient performance, Florreich must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation simplified). The question of deficient performance "is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Barela*, 2015 UT 22, ¶ 21, 349 P.3d 676.

¶28  To establish prejudice, Florreich "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[T]o evaluate prejudice, we assess counterfactual[] scenarios—that is, what would have happened but for the ineffective assistance," and "we may do so with the evidence available to us, even when not part of the original record." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203. And in "the event it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, we will do so without analyzing whether counsel's performance was professionally unreasonable." *Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 (quotation simplified).

¶29  We'll address Florreich's claims as follows: first, we'll address her claim that Counsel was ineffective for not filing a motion to exclude the admissions that she made during the pretext call and the interrogation; second, we'll address her claim that Counsel rendered ineffective assistance through his choice of strategy, and alongside that claim, we'll address her request for a rule 23B remand on two related claims of ineffective assistance;

and finally, we'll address Florreich's remaining ineffective assistance claims.

## I. Florreich's Admissions

¶30 Florreich argues that Counsel was ineffective for not moving to suppress the admissions she made during the pretext call and the police interrogation. In Florreich's view, the admissions she made during the pretext call were the product of unconstitutional coercion and the admissions she made in the interrogation were suppressible as fruits of that earlier constitutional violation. But "because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." *State v. Powell*, 2020 UT App 63, ¶ 20, 463 P.3d 705 (quotation simplified). In our view, there was no meritorious basis for moving to suppress these admissions. As a result, we conclude that Counsel did not perform deficiently.

¶31 The Constitution provides two guarantees against involuntary confessions that are potentially implicated by Florreich's arguments here:

> The Fifth Amendment protects individuals from being compelled to give evidence against themselves. Furthermore, under the Due Process Clause of the Fourteenth Amendment, certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.

*State v. Bunting*, 2002 UT App 195, ¶ 14, 51 P.3d 37 (quotation simplified).

¶32 For these purposes, a confession is involuntary where, under the totality of the circumstances, a defendant's "will was overborne." *State v. Rettenberger*, 1999 UT 80, ¶ 19, 984 P.2d 1009 (quotation simplified). Courts consider a range of objective and subjective factors when evaluating whether this was so in a given case. *See id*. ¶¶ 20, 37. The objective factors include "the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Id*. ¶ 14. The subjective factors include "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id*. ¶ 15. Importantly, a "defendant's mental condition is not in itself sufficient to make a confession involuntary." *Id*. ¶ 17. And "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).[7]

¶33 Florreich argues that her admissions were coerced because of a combination of (1) misrepresentations by Alex; (2) Alex's use of the "false friend" technique; (3) Alex's threats and promises; (4) the close relationship they had as nanny and child; and (5) her own subjective characteristics that allegedly made her susceptible to a false confession. We stress upfront that because this is a totality of the circumstances analysis, the factors must ultimately be assessed together to determine whether Florreich's admissions were involuntary. But we begin

---

7. The State agrees that Alex was acting as a state agent for purposes of the pretext phone call in this case. *Cf. Orem City v. Santos*, 2013 UT App 155, ¶ 7, 304 P.3d 883 (noting that "[w]hen a private party acts as an agent of the government authority, any search performed by that private party becomes subject to state and federal constitutional protections").

by examining each argument in turn, and in doing so, we conclude that Florreich has failed to persuade us that any particular factor rendered her statements involuntary. As a result, whether viewed individually or collectively, we see no basis for concluding that her admissions were unconstitutionally coerced.

¶34 **Misrepresentations.** Cases that have focused on misrepresentations made during an interrogation have most commonly considered misrepresentations about how much evidence police officers have obtained of the defendant's guilt. *See, e.g., State v. Fullerton*, 2018 UT 49, ¶ 40, 428 P.3d 1052; *Rettenberger*, 1999 UT 80, ¶ 20; *State v. Galli*, 967 P.2d 930, 936 (Utah 1998); *State v. Apodaca*, 2018 UT App 131, ¶¶ 55–56, 428 P.3d 99, *aff'd*, 2019 UT 54, 448 P.3d 1255; *State v. Leiva-Perez*, 2016 UT App 237, ¶¶ 22–23, 391 P.3d 287; *State v. Maestas*, 2012 UT App 53, ¶ 32, 272 P.3d 769. As explained by our supreme court in *Rettenberger*, the constitutional concern in such cases is that "a suspect may well determine that continued resistance is futile (because the police have evidence that will convict him despite his innocence)," thus causing the suspect to "conclude that, given the futility of resistance, it is most prudent to cooperate and even confess falsely in order to get leniency." 1999 UT 80, ¶ 22 (quotation simplified). In such a scenario, courts thus consider whether the state actor's misrepresentations were "sufficiently egregious to overcome a defendant's will so as to render" the resultant "confession involuntary." *Id*. ¶ 20. In *Rettenberger*, for example, our supreme court concluded that the confession in question was coerced where police had made 36 false statements to the defendant, many of which involved "complete fabrications about testimonial and physical evidence" of guilt. *Id*. ¶ 21.

¶35 The misrepresentations at issue here occurred during a pretext call, not a police interrogation. And it's true that a pretext call will by definition involve at least some deception—after all, it's the misrepresentation about the call's purpose that turns an

ordinary call into a pretext call.[8] But still, it's simply not the case that any misrepresentation by a state actor is enough to render a confession involuntary as a categorical rule. As noted, the question of involuntariness is ultimately assessed under the totality of the circumstances. And while cases involving "egregious" misrepresentations about the collected evidence can sometimes render a confession involuntary, the reason for this is the possibility that the suspect will be convinced that further resistance is futile. *Id*. ¶¶ 20, 22 (quotation simplified). We see no similar cause for concern stemming from the misrepresentation at issue here.

¶36 The only misrepresentation that Florreich points to is Alex's misrepresentation about the purpose of his call—namely, that he was calling to discuss the alleged sexual dysfunction in his marriage. But while this misrepresentation may have caused Florreich to feel more comfortable talking to Alex, we simply don't believe that it was the type of misrepresentation that would have overcome Florreich's will and coerced her into confessing things to him. Unlike the false-evidence scenario described above (where a suspect might worry about personal ramifications that would result from non-cooperation), Florreich could have declined to discuss any past sexual encounters or offer any advice.

¶37 The particular nature of this conversation supports this conclusion. After all, the misrepresentation at issue was made during a phone call with someone she considered to be a friend.

---

8. As explained in one article on the subject, "pretext calls" are understood to be those where "police ask the alleged victim to make a recorded call to a suspect, typically from the police station. Police instruct the person about what kinds of admissions are needed to secure conviction, as well as suggested strategies to try and elicit them." Deborah Davis et al., *Interrogation by Proxy: The Growing Role of Lay and Undercover Interrogators in Eliciting Criminal Confessions*, 59 Crim. L. Bull. 395, 399 (2023).

This was a qualitatively different kind of conversation than, say, a conversation between a police officer and a suspect during an interrogation. Unlike the pressures involved in that scenario, Florreich had no particular reason here to believe that she had no choice but to talk to Alex about these things. If she didn't want to talk to him, she could have hung up. Due in part to such realities, our supreme court recently noted in the *Miranda* context that the "'inherently compelling pressures' of an interrogation are simply not present during phone calls to friends and family." *State v. Wood*, 2023 UT 15, ¶ 47 n.7, 532 P.3d 997 (quotation simplified). And in the pretext call context, a recent peer-reviewed study was "unable to find" a single case where a court has held that a pretext call overcame a suspect's will. Deborah Davis et al., *Interrogation by Proxy: The Growing Role of Lay and Undercover Interrogators in Eliciting Criminal Confessions*, 59 Crim. L. Bull. 395, 417 (2023).

¶38　In her reply brief, Florreich points to a recent case from Utah's First District in which a pretext call was suppressed, and we note that the decision in question is currently pending before this court on appeal. *See State v. Lewis*, No. 191101288, (Utah 1st Dist., June 29, 2021). The district court's suppression decision in *Lewis* is not binding in this appeal, however. And we also note that the facts of that case (which were set forth in the order that was provided to us by Florreich) are different and at least arguably distinguishable. We have no need to definitively rule here that pretext calls as a category are or are not coercive. But in light of the question before us in this case, we do conclude that the nature of this call at least somewhat undermines the suggestion that Alex's misrepresentation made the call coercive.

¶39　And finally, we note that Florreich's own conduct during the remainder of the call also suggests that she did not feel forced by this misrepresentation to say things that she didn't want to say. For example, when Alex asked Florreich if she remembered his mother walking in on them in the baby sister's room, she emphatically disagreed, saying, "No way." While perhaps not

dispositive on its own, this showed that Florreich retained the wherewithal to push back if Alex made an assertion with which she disagreed.

¶40 Pulling all this together, we don't regard the kind of misrepresentation at issue as having been particularly problematic from a coercion standpoint, and the circumstances surrounding the misrepresentation and Florreich's response to it corroborate that conclusion.

¶41 **False Friend Technique.** In a related vein, Florreich claims that her admissions were involuntary because Alex had used the "false friend" technique. We disagree.

¶42 The false friend technique is not implicated simply because the questioner was friendly or even friends with the suspect. Rather, this technique is understood to involve a situation where "the interrogator represents that he is a friend *acting in the suspect's best interest.*" *State v. Montero*, 2008 UT App 285, ¶ 18, 191 P.3d 828 (emphasis added). In a variety of cases, Utah's appellate courts have analyzed false friend claims along these lines—i.e., by considering whether the questioner suggested that he or she was acting in the suspect's best interests by encouraging the suspect to confess or cooperate. *See, e.g., Apodaca*, 2019 UT 54, ¶ 36 (one detective that said he "understood" the suspect's "hard life" but "that other officers might not be so understanding," while another offered to protect the suspect from retribution if he named his accomplice (quotation simplified)); *State v. Arriaga-Luna*, 2013 UT 56, ¶ 4, 311 P.3d 1028 (a detective spoke to the suspect in his native language, made small talk before the interview, and told the suspect that "he wanted to help him and his family"); *Montero*, 2008 UT App 285, ¶ 18 (the officer offered to "do whatever [he] can to help" the suspect out); *State v. Werner*, 2003 UT App 268, ¶ 21, 76 P.3d 204 (the officer encouraged the suspect to "tell me something that makes" the suspected criminal activity "not a first degree" (quotation simplified)); *Bunting*, 2002 UT App 195, ¶ 26

(detectives "suggested that they would act on" the suspect's "behalf in going to the district attorney").

¶43    Here, Alex never suggested that Florreich needed to talk to him about their past encounters to serve Florreich's interests. Instead, Alex told Florreich that the reason for this call was to serve Alex's interests. Again, he told Florreich that he was trying to heal his sexual relationship with his wife and that he was trying to figure out "how [he] should feel" about his past with Florreich. And Florreich confirmed that this was her understanding of the conversation too, telling him that she would "be happy to talk with" him to help him "know . . . how [he] can deal with [his] wife." The Alex-centered nature of this exchange was further underlined by a moment in which Alex said, "[I]nstead of paying my therapist all that money, I should have just called you," to which Florreich responded, "Well, [Alex], you know I'm a teacher." Thus, we see no place in the record of this call where Alex falsely suggested that he was trying to help Florreich as her friend by encouraging her to talk about these things, which distinguishes this call from those that have been analyzed under the false friend rubric.[9]

---

9. In any event, even if this call could be construed as having involved this technique, we have recognized that "standing alone, the false-friend technique is not sufficiently coercive to produce an involuntary confession, but may be significant in relation to other tactics and factors." *State v. Apodaca*, 2019 UT 54, ¶ 37, 448 P.3d 1255 (quotation simplified). In particular, the "false-friend technique may be coercive if a defendant has below-average cognitive abilities or other cognitive disabilities." *State v. Leiva-Perez*, 2016 UT App 237, ¶ 19, 391 P.3d 287 (quotation simplified). For the reasons set forth shortly, we see no basis for concluding that Florreich had any subjective factors that made her particularly susceptible to manipulative or coercive conduct. As a

(continued…)

¶44 **Threats and Promises.** Florreich next argues that Alex's attempts to keep her on the call while they were experiencing connection issues "were akin to threats and promises." Specifically, she points to Alex's suggestion that, if she hung up, "he might not be able to speak again before she left town." But this isn't akin to the type of "threat" or "promise" contemplated by past coercion cases.

¶45 The standalone phrase "threats and promises" originated as a section heading in *Rettenberger*, and it referred to a specific kind of threat and promise: "a threat of greater punishment or a promise for lesser punishment depending on whether a defendant confessed." 1999 UT 80, ¶ 29 (quotation simplified). By contrast, we've suggested that "possibilities over which the police clearly exercise no control" do not "amount[] to a threat or promise of the kind pertinent to our inquiry." *State v. Prows*, 2011 UT App 9, ¶ 10 n.4, 246 P.3d 1200. In *Prows*, for example, we held that police officers' suggestion that a man's stepdaughter could repeat "the cycle of abuse" if he did not confess did not constitute coercion, since officers had no control over the stepdaughter's life outcomes. *Id.* And this makes sense. As explained by the Supreme Court, the "Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Connelly*, 479 U.S. at 170 (quotation simplified).

¶46 The potential wrinkle here is that this was a pretext call. On the one hand, it's true (as the State has conceded) that Alex was functioning as a state actor. But on the other hand, Florreich didn't know that he was acting with any state involvement, so it's somewhat unclear to us whether this statement from this call even

result, even if we construed this call as having employed this technique, we would still not regard the call as being coercive.

could qualify as "official coercion" for purposes of this kind of analysis.

¶47    But we need not decide whether this was so, because the supposed "threat"—that Florreich might not have another chance to talk to Alex again before she left—was something of a benign statement of the sort that would commonly be made during conversations between friends. In this sense, any pressure that it created was "moral and psychological," *id.* (quotation simplified), not a threat of official coercion. Florreich points to no case (and we're aware of none) in which a statement like this was ever deemed to have rendered a resultant statement involuntary. And we see no basis for concluding that this was so here.

¶48    **Close Relationship.** Florreich argues that the close relationship she had with Alex as his childhood nanny also made her admissions to him involuntary. In support, Florreich points to *Arriaga-Luna*, a case in which our supreme court held that "the intense loyalty and emotion present in most parent-child relationships" can provide "an opportunity for coercion" if it is improperly used by police during an interrogation. 2013 UT 56, ¶ 14.

¶49    As with the threats and promises factor we just discussed, we have some question about whether this factor translates directly to the context of a pretext call. It's one thing for officers to make direct reference to a suspect's children—depending on the statement and context, such references might cause the suspect to worry about the interplay between state power and the suspect's children. It may well be different, however, when a person who's perceived to be family or a friend makes reference to the suspect's children.

¶50    In any event, assuming for argument only that this factor can apply in this context, we still see nothing coercive here. We have no doubt that a nanny-child relationship can be close and

even familial in some instances. But the same is obviously true about a parent-child relationship, and yet *Arriaga-Luna* refused to "adopt any per se rule regarding the effect of references to a defendant's children on the voluntariness of a confession." *Id.* Thus, even though officers in that case had procured a suspect's confession, in part, through targeted appeals to the suspect's love for his children, the supreme court still engaged in a totality of the circumstances assessment of the various factors and, of note, ultimately concluded that the statements in question were voluntary. *See id.* ¶¶ 15–22.

¶51   Having considered the matter here, we disagree with Florreich's suggestion that her relationship with Alex alone was so close that her statements were involuntary. And in light of our assessment of the various other factors at issue, we likewise see no basis for concluding that her admissions to him were involuntary.

¶52   **Subjective Factors.** Finally, Florreich points to several characteristics that, in her estimation, made her more susceptible to manipulation or coercion: that she was an older immigrant with limited education, that she has an IQ "in the low-average range," that her work history consisted of "low-paying childcare jobs," and that she has no experience with the criminal justice system.

¶53   Florreich suggests that these characteristics rendered her confession involuntary. But as an initial matter, it's not clear that Florreich was as subjectively compromised as she now suggests. As the State points out, testing had shown that Florreich had an IQ in the average range for adults, Florreich had attended two years of post-secondary education, Florreich had worked for several years as a teacher, and Florreich had lived in the United States for almost four decades at the time of this call.

¶54   Moreover, in such cases, the critical question is whether the defendant's subjective characteristics affected her "ability to

understand what [was] happening." *Leiva-Perez*, 2016 UT App 237, ¶ 33 (quotation simplified). But "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly*, 479 U.S. at 170; *see also Rettenberger*, 1999 UT 80, ¶ 18 (a "confession may be suppressed in circumstances in which a police officer knows of a suspect's mental illness or deficiencies at the time of the interrogation and effectively exploits those weaknesses to obtain a confession").

¶55 In attempting to show that there was a "causal connection" between her subjective characteristics and her admissions, Florreich claims that she "was having difficulty understanding Alex yet remained on the line at his insistence." But in the call itself, her complaints about her inability to understand Alex were focused on the quality of the phone connection, and, with a single exception, those complaints ceased before the discussion turned to their past sexual encounters. And that single exception only confirms this point. Midway through the call, and after the two had already talked about the sexual encounters, the phone connection dropped. Alex immediately called back, however, and when Florreich answered, the conversation continued where it had left off. So while the record of this call shows that Florreich sometimes had difficulty understanding Alex on an auditory level, that was temporary, not permanent, and we see nothing suggesting that she was incapable of understanding the meaning or substance of what they were talking about.

¶56 And this leads back to the ultimate question, which is whether, under the totality of the circumstances, the conversation was so coercive that Florreich's will was overborne. On the record and arguments that have been presented to us, we see no basis for concluding that any combination of factors identified from the pretext call rose to that level. As a result, we see no basis for concluding that Counsel performed deficiently by not moving to suppress those admissions.

¶57    And because of this, we likewise reject Florreich's claim that Counsel performed deficiently by not moving to suppress her statements from the police interrogation. As noted, Florreich's argument here is that these statements were the fruit of the poisonous tree. But since we've rejected her attack on the pretext call itself, this argument necessarily fails too. *See Oregon v. Elstad*, 470 U.S. 298, 305 (1985) ("Respondent's contention that his confession . . . must be excluded as 'fruit of the poisonous tree' assumes the existence of a [prior] constitutional violation."); *State v. Lee*, 633 P.2d 48, 52 (Utah 1981) (where the initial "search was not unconstitutional, the subsequent seizure could not be 'fruit of the poisonous tree'").

## II. Defense Strategy

¶58    As noted, Counsel's strategy at trial was to argue that Alex initiated and even pressured Florreich into the sexual acts, and Counsel secondarily argued that Detective's investigation was one-sided and slanted. Florreich now argues that this strategy was objectively unreasonable and that Counsel provided ineffective assistance by choosing it. In addition, Florreich has filed a motion under rule 23B of the Utah Rules of Appellate Procedure contemporaneous with her brief, wherein she requests a remand for factual development of whether Counsel was ineffective for not investigating and presenting a false confession defense instead. We disagree with Florreich's claim, and, for related reasons, we likewise reject the request for a rule 23B remand.

¶59    "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. When assessing an ineffective assistance claim, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Because "of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance." *Id.* When considering a choice-of-strategy claim like Florreich's, the relevant question "is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial." *Barela*, 2015 UT 22, ¶ 21. Rather, the question is "whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *Id.* In making this assessment, an appellate court must recognize that the "calculations of counsel in weighing the pros and cons of one strategy over another are, in essence, a judgment about what is most likely to work to the client's benefit in a complex trial process that requires that many choices be made." *State v. Rivera*, 2022 UT App 44, ¶ 38, 509 P.3d 257 (quotation simplified). "In such cases, so long as counsel could have reasonably chosen the strategy in question, and so long as the strategy is itself reasonable, the claim must fail." *Id.*

¶60      Moreover, this review must take into account the facts and information that were available to trial counsel when making these strategic decisions. "After all, an attorney must play the hand he or she is dealt, and an attorney's decision about how to deal with adverse facts is the sort of thing that courts should not second-guess in the context of ineffective assistance claims." *State v. Garcia*, 2017 UT App 200, ¶ 23, 407 P.3d 1061.

¶61      The State's case here largely relied on two things: (1) Alex's in-court testimony, wherein Alex detailed the alleged sexual encounters, and (2) Florreich's statements from the pretext call and her interrogation, wherein Florreich had admitted to much of the alleged conduct. Counsel could only deal with Alex's in-court testimony through cross-examination. The question at issue in this claim centers on how Counsel chose to deal with Florreich's own admissions.

¶62      As framed by the parties on appeal, it appears that Counsel essentially had two options: he could try to go through those

admissions, or he could instead try to go around them. First, he could try to go through those admissions by challenging them directly, such as by trying to show that they were false confessions. Or second, Counsel could accept the admissions at face value but then try to get around them by arguing that even if they established that the conduct occurred, Florreich should still be acquitted.

¶63 Counsel chose the latter approach. And there was at least some factual hook for doing so. After all, Alex had admitted that he did initiate many of the sexual encounters. Also, Florreich was a Tongan immigrant who was employed as a nanny by Alex's family, thus providing some basis for Counsel to argue that Florreich had complied with Alex's requests only because Alex had power over her. Moreover, Florreich had told Detective during the interrogation that she thought the oral sex incident was "rape," which further advanced a defense that was partially based on her assertion that she had been compelled to engage in the conduct. As explained above, Counsel thus argued that Florreich's only intent was "to survive," as opposed to having an intent to "cause [Alex] sexual arousal," and that there was accordingly reasonable doubt as to whether the State had proven the mens rea elements of the specific intent crimes at issue.

¶64 Florreich nevertheless argues on appeal that this strategy was problematic. And we do agree that this was so. After all, one of its underlying themes was that Alex was the sexual aggressor, even though he was a young boy when the encounters started and Florreich was an adult woman throughout. Moreover, under Utah law, all the State had to show was that Florreich intended to "arouse or gratify the sexual desire of *any* individual"—which would have included Alex's sexual desires. Utah Code § 76-5-404(2)(a)(ii)(B) (emphasis added). For these reasons, Florreich has persuaded us that there were indeed problems with the chosen approach.

¶65    But even so, Counsel still had to advance *some* defense. So to prevail on this ineffective assistance claim, it's not enough for Florreich to just show that the approach Counsel took was problematic. She also needs to show that Counsel should have done something else instead. The alternative approach that she advances on appeal, however, had clear problems of its own. Again, Florreich argues that instead of offering an explanation for the sexual conduct, Counsel should have argued that she had falsely confessed to the allegations during the pretext call—in effect, contending that the alleged conduct never happened. But the problem with that proposed defense is that the jury had heard Florreich acknowledge, in recordings of two separate conversations, that this conduct had in fact occurred. So to have worked, this approach would have required Counsel to have argued that Florreich was not credible.

¶66    As an initial matter, Counsel may have had some understandable reluctance at advancing a defense that was based on discrediting his own client in the eyes of the jury that was being asked to judge her. This alone is reason why Counsel may have been skeptical of this potential defense.

¶67    In addition, Florreich acknowledges on appeal that this particular defense would have needed the support of expert testimony. But taking this route would have opened the door to contrary testimony from a State expert. And this matters. After all, when evaluating an ineffective assistance claim, courts must "consider not just what did happen at trial, but also what would have happened, including evidence that would have come in but didn't as a result of counsel's decisions." *Ross*, 2019 UT 48, ¶ 76 (quotation simplified). So here, Counsel could reasonably have been concerned that if he put on expert testimony suggesting that these were false confessions, he'd be gambling that the jury would not instead be more persuaded by any contrary testimony from the anticipated experts from the State. As recognized by our

supreme court in the similar context of eyewitness identification experts, if proposed expert testimony from the defense backfires (i.e., if the jury finds the State's experts more credible), this might embolden the jury "to give *more* weight" to the very evidence that the defense was trying to undermine by presenting the expert testimony in question. *State v. Perea*, 2013 UT 68, ¶ 73, 322 P.3d 624 (emphasis added).

¶68 Indeed, this potential danger is actually illustrated by Florreich's request for a rule 23B remand in this case.

¶69 As an initial matter, we deny Florreich's request for a remand on the question of whether Counsel inadequately investigated this potential defense. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 690–91. And in support of her rule 23B motion, Florreich has submitted an affidavit from Counsel in which he avers that a false confession strategy was his first choice and that he spoke to two false confession experts while investigating the possibility of using it, both of whom reportedly advised Counsel that, on these facts, they could not be of assistance.

¶70 In opposing this motion, the State suggests that the number of experts that Counsel consulted might actually have been higher. On this, the State points to statements from the record that, though a touch unclear, seem to indicate that Counsel spoke to four experts. Florreich pushes back on the State's reading of the record, claiming that it doesn't show that Counsel spoke to four experts. And with respect to Counsel's affidavit in support of the rule 23B remand, Florreich points out that the second expert identified by Counsel had no recollection of the events when appellate counsel contacted him; from this, Florreich asks us to assume that Counsel might not have actually spoken to this expert either.

¶71    On the lack of investigation claim, we need not decide whether the actual number of experts Counsel consulted was one, two, or four. On the investigation front, *Strickland* requires a reasonable investigation, not a limitless one. Florreich points to no authority establishing that an attorney who found and then consulted with one or more experts in support of a possible strategy had an obligation under the Sixth Amendment to do more. We're accordingly not persuaded that Counsel was required to do more here than he did.

¶72    This leaves Florreich's next (and primary) argument, which is that Counsel should have presented a false confession theory at trial. And in support of this aspect of her rule 23B motion, Florreich attaches affidavits from two experts who claim that they would have testified that her admissions carried the hallmarks of a false confession.

¶73    But the one expert who both parties agree Counsel did consult at the time was Dr. Daniel Reisberg, and Dr. Reisberg expressed the opposite view. In an affidavit from Counsel that Florreich filed in conjunction with her rule 23B motion, Counsel says that Dr. Reisberg told him that "the interview(s) did not have the type of hallmarks [he] would look for in order to testify as an expert that the confession was false." According to Counsel, Dr. Reisberg affirmatively "advised" him "to find an alternate defense." In light of this, Counsel says that he concluded that calling an expert to support a false confession defense would "probably be more damaging than helpful" to Florreich because, on cross-examination, the expert would have to acknowledge that her confession might not have borne the hallmarks of a false confession.

¶74    Florreich now assails Counsel's decision. In Florreich's view, the sole role of an expert at trial would have been to testify about the general hallmarks of a false confession. From this, she surmises that there was no risk of a damaging cross-examination

because the rules of evidence bar expert witnesses from "testifying that a particular witness is or is not testifying truthfully." But the rule she relies on, rule 608(a), "does not prohibit an expert . . . from giving testimony from which a jury could infer the veracity of the witness. Rather, it only bars direct testimony regarding the truthfulness of a witness on a particular occasion." *State v. Adams*, 2000 UT 42, ¶ 14, 5 P.3d 642 (quotation simplified). So here, it's true that an expert couldn't have testified that Florreich was (or wasn't) actually giving a false confession during the pretext call. But if an expert could have testified that Florreich's testimony had some of the hallmarks of false confession (which is what Florreich argues is the useful testimony that Counsel should have presented), then that same expert could have also testified that Florreich's confession instead lacked the hallmarks of a false confession.

¶75   And this was the problem. Suppose that Counsel had kept investigating, and suppose that Counsel had found an expert who was willing to testify that Florreich's confession carried the hallmarks of a false confession. At this point, Counsel would have known from his own investigation that the State could and very likely would then produce an expert to say that these confessions didn't carry the hallmarks of a false confession. Because of this, the result of this proposed approach wouldn't have only been the addition of unchallenged expert testimony suggesting that Florreich had falsely confessed; rather, the likely result would have additionally included expert testimony suggesting that Florreich's confession was not false, thus resulting in a battle of dueling experts; and if the jury found the State's experts to be more credible, this jury would now have even more reason to focus on and then credit Florreich's seemingly damning admissions. And this is precisely what Dr. Reisberg had warned about—that presenting this defense would "probably be more damaging than helpful" to Florreich in the end.

¶76 Against this backdrop, we can still envision some (or maybe even many) attorneys who would have preferred this approach to the one that was actually presented by Counsel at Florreich's trial. But again, Counsel had been advised by an expert in this field that a potential defense based on a false confession theory was problematic and that he needed "to find an alternate defense." And "courts have long held that it is reasonable for counsel to rely on the judgment and recommendations of qualified experts with expertise beyond counsel's knowledge." *Archuleta*, 2011 UT 73, ¶ 129. We remain cognizant of *Strickland*'s caution that there "are countless ways to provide effective assistance in any given case" and that "even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689 (quotation simplified). Even if we might have chosen the approach proposed by Florreich on appeal, the question before us is whether the approach that was chosen by Counsel was so objectively unreasonable that it violated the Sixth Amendment. On this record, we don't believe that it was.

¶77 As a final and related matter, Florreich also argues in her 23B motion that Counsel should have called two additional fact witnesses. The first witness had employed Florreich as a nanny for several years. In an affidavit, this witness says that Florreich had a tendency to say yes or no even when she did not understand something, as well as a tendency to be agreeable as a means of avoiding potential confrontation. This witness also remembered Florreich telling her that Alex had several behavioral problems (including some involving aggression) and that Florreich was not permitted to discipline Alex or his siblings. The second witness was someone from another family whom Florreich had nannied during the same period that she was nannying the children in Alex's family. (In her affidavit, she explained that Florreich nannied Alex and his siblings during the day and that Florreich would nanny this witness and her siblings at night.) This witness said that Florreich "did not handle confrontation well," and she

also recalled Florreich telling her that Alex and his siblings "would bully her, make fun of her, and play games on her."

¶78    To the extent that these witnesses would have supported a false confession defense, we see no need for a remand. Again, the crux of the proposed defense would have been expert testimony, but it was within Counsel's prerogative to prefer an approach that tried to explain the admissions away, rather than provoking a battle of dueling experts in the hopes that the jury would conclude that Florreich hadn't been telling the truth in either the pretext call or the interrogation.

¶79    Florreich also suggests that these witnesses might have supported the defense that Counsel actually ran—which, again, was that Florreich had only performed the sexual acts because she was generally agreeable or even felt threatened, and that she never had the specific intent to gratify Alex's sexual desires. But much of this proposed testimony would have been hearsay, and Florreich has not carried her burden of persuading us that any hearsay exception applied. And while some of this testimony was not hearsay (such as testimony about the witnesses' firsthand observations of Florreich's tendency to act agreeably), this testimony would have been cumulative of testimony of the witness Counsel did call. In any event, given the strength of Alex's testimony and the specificity of Florreich's admissions during the pretext call and then the interrogation, we don't believe that adding these additional facts would have persuaded the jury that Florreich had not performed the sexual acts in question. We thus deny this aspect of the rule 23B motion.

¶80    In short, this seems to have been a case in which Counsel had no good strategic options. The one he chose had obvious problems. But the one that Florreich now proposes on appeal had obvious problems too. While one could certainly disagree about which set of problems was worse, we ultimately conclude that Counsel could reasonably take the advice of the consulted expert

and reasonably decide against presenting a false confession defense. From there, we see no basis for concluding that Counsel acted in an objectively unreasonable manner with the strategy that he did advance at trial. We accordingly reject this ineffective assistance claim and deny the associated motion for a rule 23B remand.[10]

### III. Remaining Ineffective Assistance Claims

¶81 Florreich raises ten other ineffective assistance claims. Specifically, Florreich claims that Counsel was ineffective for:

- telling jurors in the opening statement that "no one was going to lie" to them;

- not objecting when Detective repeatedly called Florreich a liar;

- not objecting when Detective bolstered Alex's testimony;

---

10. In the memo supporting her rule 23B motion, Florreich also argued that the rule 23B scheme is unconstitutional because it does not grant defendants discovery powers. But before Florreich filed her rule 23B motion and appellate brief, Florreich's appellate counsel raised concerns relating to Counsel's lack of cooperation in providing his files. In response, we issued an order suggesting that we might compel Counsel to cooperate if Counsel did not provide the requested information forthwith. Florreich did not subsequently ask for further assistance, nor has she indicated that she did not receive the requested information. As a result, she has not shown that she "has been or will be injured" in this case by any alleged infirmity with respect to this aspect of the rule 23B scheme, so we reject this argument and need not address it. *See State v. Roberts*, 2015 UT 24, ¶¶ 46–47, 345 P.3d 1226.

- not objecting when Detective claimed at trial that Counsel was misleading the jury;

- not objecting to various references to Alex as a "victim";

- abandoning the initial objection to testimony about the sexual encounter between Alex and Florreich that occurred after Alex turned 18;

- making a comparison that used Hitler as a reference point;

- eliciting testimony about Florreich's religious beliefs and activity;

- failing to object to unsubstantiated evidence that Florreich had extramarital sex with someone else; and

- eliciting damaging testimony from the defense's only witness.[11]

¶82　As noted, an appellate court can reject an ineffective assistance claim for a lack of either deficient performance or prejudice. If an appellate court's decision rests on the lack of prejudice, the court must take into account "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. This means that "it is necessary to consider *all* the relevant evidence that the jury would have had before it if [trial counsel] had pursued the different path." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam) (emphasis in original).

¶83　Given the large number of claims that remain, it's appropriate to first address a few of the claims for which we think

---

11. We recognize that we did not provide full accounts of the circumstances surrounding each of these claims in the Background. To the extent necessary for resolution of this appeal, we do so as necessary below.

it fairly clear that there was no deficient performance. From there, we then conclude that Florreich was not prejudiced by any deficient performance with respect to the remaining claims (either individually or even cumulatively), and with respect to these claims, we do so without deciding whether there was in fact deficient performance.

A.      Claims for Which There Was No Deficient Performance

¶84     **Telling jurors that "no one was going to lie" to them.** In his opening statement, Counsel told the jury, "Both sides are going to try to make sense of the other side's story, and we're going to try to present to you the facts in a light that shows you what our point of view in the case is. And nobody is going to lie to you on this case." On appeal, Florreich argues that Counsel performed deficiently by making this statement because the jury would likely have interpreted this statement as Counsel somehow vouching for Alex's credibility as a witness.

¶85     Even in isolation, however, the word "nobody" in this claim is best understood as a reference to the attorneys, not the witnesses. In this sense, the assertion seems to have been that the attorneys were all proceeding in good faith, which could have served the goal of trying to curry favor with the jury by appearing reasonable. While Counsel certainly could have been clearer about this, the statement still must be read in its broader context. And in light of that context, there was no real risk that the jury would have thought that Counsel was saying that Alex was always telling the whole truth. After all, the point of the pretext call was that Alex had lied to Florreich about the call's purpose, a point that Counsel emphasized to the jury. And while it's true that Counsel's strategy acknowledged that many of the alleged sexual encounters had occurred, it's also true that Counsel repeatedly suggested that Alex was the initiator and that, contrary to Alex's claims, Florreich had effectively been coerced. Indeed, Counsel ended his opening statement with the line,

"Remember that the best . . . lies that are ever told are mostly true."

¶86   The Sixth Amendment is not violated by the occasional poor word choice, particularly where counsel's intended meaning would have been plain enough to those in the room. In this instance, we see no realistic chance that the jury would have interpreted this isolated statement in the manner that Florreich is now suggesting. We see no basis for concluding that it was deficient performance.

¶87   **Not objecting when Detective called Florreich a liar.** During portions of the interrogation, Detective repeatedly told Florreich that he thought she was lying. During cross-examination at trial, Counsel elicited admissions from Detective that he had repeatedly raised his voice with Florreich and that he had called her a liar "a lot." Florreich now argues that it was objectively unreasonable for Counsel to ask questions that effectively elicited unfavorable testimony about Florreich's truthfulness, particularly given that it may have violated rule 608 of the Utah Rules of Evidence.

¶88   Reviewing the record more closely, however, we disagree with Florreich's assertion that Counsel did elicit testimony about her truthfulness. As pointed out by the State in its brief, Counsel never "asked [Detective] whether Florreich actually lied or whether he believed Florreich lied." Instead, Counsel's questions focused on Detective's behavior during the interrogation, asking how many times *he had called* her a liar. And the reason for doing so was clear. As explained, part of the defense strategy was to argue that Detective had prejudged the case and that his investigation was tainted. As part of this, for example, Counsel repeatedly argued that Detective had improperly decided not to investigate Florreich's own claim that Alex had "raped" her.

¶89   This is reason enough to reject this claim of deficient performance. In addition, we also note that audio of the interrogation had already been played for the jury; and, as discussed, Florreich has not persuaded us that it could have been excluded. As a result, even before this cross-examination, the jury had already heard Detective's statements from the interrogation in which he said that he thought Florreich was lying to him. Since Counsel could not have excluded those references, the apparent goal during cross-examination was to try and blunt their effect. Because the questions at issue seemed directed at serving that goal, we see no deficient performance.

¶90   **Failing to object to unsubstantiated evidence of extramarital sex.** At trial, the jury heard a brief snippet of the interrogation in which Detective referred to a moment from the pretext call in which Florreich had told Alex about a time she had sex with a man in a park. When Prosecutor stopped the recording, approached the bench, and asked for permission to skip over that story, Counsel protested. Counsel initially argued that they "should listen to the whole thing," after which Counsel obtained the court's agreement that he could play the rest of the story later under the rule of completeness. Counsel did not later play the rest of that story for the jury.

¶91   On appeal, Florreich first argues that the portion of the interview that was played for the jury was improper. We agree. But this leaves the question of what Counsel should have done about it. Florreich now argues that Counsel was ineffective for not requesting a curative instruction to combat its effects. While we agree that Counsel could have requested such an instruction, we don't believe that Counsel was constitutionally required to do so.

> Utah courts have long recognized that defense counsel's decision not to request an available curative instruction may be construed as sound trial

strategy. Indeed, a curative instruction may actually serve to draw the jury's attention toward the subject matter of the instruction and further emphasize the issue the instruction is attempting to cure. Counsel could have reasonably determined that [they] would be ill-advised to call undue attention to the testimony, particularly when it was unanticipated and brief.

*State v. Arnold*, 2023 UT App 68, ¶ 79, 532 P.3d 1267 (quotation simplified), *cert. denied*, 532 P.3d 1267 (Utah 2023).

¶92 The exchange at issue here fits comfortably within these parameters. After all, the jury heard only a brief portion of this inadmissible story, and that story was cut off before it was developed at any length. Indeed, from what the record tells us, it's possible that some jurors might not have even registered what had occurred.[12] If Counsel had requested a curative instruction, this instruction could have caused jurors to now focus on this story. Under these circumstances, Counsel could reasonably have decided that the best course of action was to let the moment slide, rather than calling any more attention to it through the issuance of a curative instruction. There accordingly was no deficient performance on this point.

¶93 **Abandoning an objection to evidence of the adult sexual encounter between Alex and Florreich**. Before trial, Counsel moved to exclude any evidence of sexual contact that had occurred between Alex and Florreich after Alex had turned 18. The apparent basis for this motion was that such activity would have been consensual activity between adults and thus irrelevant to charges based on Alex's status as a minor. The State did not respond, but Counsel withdrew the objection before the court

---

12. The portion of the trial transcript that recounts the portion of the story that the jury heard spans just three lines of text.

ruled on it. Counsel offered no explanation for withdrawing this objection. At trial, Alex then testified that Florreich had performed oral sex on him after he turned 18.

¶94 On appeal, Florreich now claims that Counsel should have objected to this testimony (or, perhaps more accurately, that Counsel should have renewed the earlier objection). But we disagree, because Counsel had a reasonable strategic basis for not doing so. After Alex testified about this encounter, Counsel used this to again assail Detective's decision not to investigate Florreich's claim that Alex had "raped" her in this encounter. Not only did this implicate the investigation, but it also reinforced Florreich's claim that Alex had been the aggressor. Indeed, Counsel used this encounter to argue that Alex's years-long pattern of initiating sexual contact with Florreich had continued into his adulthood. Given this, even if Counsel could have objected, we conclude that Counsel had a reasonable basis for not doing so. There accordingly was no deficient performance. *Cf. State v. Bedell*, 2014 UT 1, ¶ 25, 322 P.3d 697 (holding that counsel could make a "legitimate strategic decision" to use evidence that might have properly been objected to under rule 404(b) of the Utah Rules of Evidence).

¶95 **Eliciting potentially damaging testimony from the defense's only witness.** In the defense's case, Counsel asked Employer about a jewelry theft involving a cleaning lady that she had hired on Florreich's recommendation. Before Counsel could get far into the story, Prosecutor objected based on relevance. The objection was sustained. On appeal, Florreich argues that Counsel should not have asked about the theft in the first place. In addition, Florreich maintains that Counsel was obligated to either request a limiting instruction or instead ask additional questions to "clarify Florreich's role."

¶96 With respect to the questioning itself, it's clear enough that Counsel was attempting to elicit testimony that he thought would

reflect favorably on Florreich. (Though, due to Prosecutor's preemptive objection, the story was cut off before this purpose was fully explained.) Counsel did not know in advance that Prosecutor would object or that the objection would be sustained, and Florreich has not persuaded us that there was any deficient performance in the attempt.

¶97 With respect to its aftermath, Counsel did what Florreich now argues he was required to do. After the court sustained the objection, meaning that Counsel could no longer ask questions about the jewelry incident, Counsel asked Employer about her opinion of Florreich's reputation for honesty or trustworthiness. She responded, in relevant part, "I think she is very honest. I think she's very trustworthy." So far as we can surmise, eliciting such an opinion was the apparent point of the attempted jewelry story, as well as of the curative actions that Florreich proposes on appeal. Given this, Florreich has not persuaded us that Counsel performed deficiently.

B.    Remaining Claims and Prejudice

¶98 This leaves five remaining claims. In brief, these claims are that Counsel was ineffective for:

- not objecting to alleged instances of bolstering by Detective;

- not objecting when Detective said he thought Counsel was misleading the jury;

- not objecting to references to Alex as a "victim";

- eliciting testimony about Florreich's religiosity (or lack thereof); and

- making a comparison that involved Hitler.

We need not decide whether Counsel performed deficiently in any of these respects. This is so because we conclude that Florreich was not prejudiced by any of them, either individually or collectively.[13]

¶99    Again, for purposes of this prejudice analysis, the question is whether there is a reasonable probability that "the result of the proceeding would have been different" but for the deficient performance. *Strickland*, 466 U.S. at 694. In support of her prejudice arguments, Florreich asserts that, in a pure credibility contest between a victim and a defendant, even a small change to the evidentiary picture could conceivably alter the trial's outcome. *See, e.g.*, *State v. Stefaniak*, 900 P.2d 1094, 1096 (Utah Ct. App. 1995). But this wasn't a pure he-said/she-said case. As discussed above, Florreich has not persuaded us that there was any basis for excluding either the pretext call or the interrogation, which means that the admissions Florreich made in those conversations were going to come in. These included Florreich's admissions that she had massaged Alex's penis with her feet, that she was impressed with the size of his penis, and that his wife would be "very lucky." And these also included the colorful flourishes that Florreich added, such as her statement that she had

---

13. Although we need not assess whether there was also deficient performance in any of these instances, we do think it important to note our discomfort with Counsel's decision to make an analogy involving Hitler. A decision to use Hitler as a reference point is one that is fraught with peril and should be avoided in most any case. And there was particular reason to avoid it here, where the trial involved an alleged crime victim who was the son of a rabbi and whose religion had been discussed by several witnesses. There were any number of better comparators, and even accounting for the seemingly off-the-cuff nature of this comment, we're hard pressed to imagine how Counsel could have thought this was a good idea. But even so, for the reasons expressed below, we conclude that Florreich was not prejudiced.

"sweet memories" of her encounters with Alex and that "with those memories, I am able to be with [my husband] to this day."

¶100   The inculpatory nature of these admissions is the reason why Florreich has argued on appeal that Counsel should have advanced a false confession defense. As we've discussed, however, there were problems with that approach, so Counsel could reasonably decide to try explaining the admissions away, rather than trying to show that Florreich wasn't telling the truth when she made them. In addition, we've also concluded above that there was no real basis for excluding these statements, so under either approach, the jury would have still heard them. Under Florreich's proposed approach, the jury would simply have additional expert testimony, some of which would very likely have suggested that these admissions did *not* have the hallmarks of false confessions.

¶101   Moreover, the State's case did not rest solely on Florreich's admissions. Alex also testified under oath at trial. In a case like this one, it seems reasonable to surmise that the jury would have placed much weight on such testimony. Alex was an adult by the time of trial, and he testified at length about his sexual encounters with Florreich, beginning with their first encounter through the end. Alex described his deep and religiously inflected guilt and shame. And he freely admitted that he had often initiated the encounters and that Florreich had sometimes turned him down. While Counsel managed to highlight a couple of discrepancies during his cross-examination of Alex, none of them were particularly serious.[14] Thus, his testimony as a whole largely supported the charges.

---

14. In one instance we've recounted above as an illustrative example, Alex told Detective that his mother "walked into the room" during one encounter before being turned away, whereas

(continued…)

¶102  Given the combined effect of Alex's sworn testimony and Florreich's recorded and admissible admissions, we see no reasonable probability that, if the trial did not involve any of the five instances of alleged deficient performance, Florreich would have received a more favorable outcome. We thus reject these remaining claims for lack of prejudice.

CONCLUSION

¶103  Florreich has raised multiple ineffective assistance claims. We have reviewed Florreich's arguments and the record. We ultimately see this as a difficult case that presented Counsel with difficult strategic choices. But we see no basis for reversing her convictions due to any of the challenged decisions, nor do we see any basis for granting her rule 23B motion. Her convictions are therefore affirmed.

––––––––––

Alex had said in the pretext call that the "door began to open" before she was turned away. But in neither instance did Alex affirmatively say that his mother had caught him and Florreich in an actual sexual act.